**PUBLIC UTILITY COMMISSION OF TEXAS, et al., Appellants,**

v.

**TEXLAND ELECTRIC CO., et al., Appellees.**

**No. 14391.**

Court of Appeals of Texas, Austin.

Dec. 11, 1985.

262

Jim Mattox, Atty. Gen., and Stephen J. Davis, Asst. Atty. Gen., Austin, for Public Utility Com'n of Texas.

Fred B. Werkenthin, Small, Craig & Werkenthin, Austin, for Lower Colorado River Authority.

Barry Bishop, Clark, Thomas, Winters & Newton, Austin, for appellees.

Before POWERS, EARL W. SMITH and CARROLL, JJ.

## ON MOTION FOR REHEARING

POWERS, Justice.

Our earlier opinion is withdrawn and the following is substituted therefor.

Texland Electric Co. sued for judicial review of an order issued by the Public Utility Commission. The order denied Texland's application for a certificate of public convenience and necessity, issuable under the Texas Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c,

§§ 49–62 (Supp.1985).[1] The Lower Colorado River Authority (LCRA) intervened in the suit. After hearing, the district court reversed the agency order and remanded the proceedings to the Commission, from which judgment the Commission and LCRA appeal. PURA §§ 69, 70; Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, §§ 19, 20 (Supp.1985). Reversing the district-court judgment, we will remand the cause to that court for proceedings not inconsistent with this opinion.

## THE PROCEEDINGS BEFORE THE COMMISSION

LCRA, a public utility as defined in PURA § 3(c), generates, transmits, and sells electric power under authority of a certificate of public convenience and necessity previously issued by the Commission. Among LCRA's customers are two other utilities, Bluebonnet Electric Cooperative, Inc. and Pedernales Electric Cooperative, Inc. Bluebonnet and Pedernales purchase electric power from LCRA under a contract that presently binds them to purchase all their electric-power requirements from LCRA. The contract expires at the end of 1999.

In April 1981, LCRA applied to the Commission for permission to amend its certificate of public convenience and necessity. Under the proposed amendment, LCRA would be authorized to construct in Fayette County a new generating plant known as "Fayette 3." Texland, controlled by Bluebonnet and Pedernales, intervened in the proceeding.

In May 1982, while the LCRA application was pending in the Commission, Texland itself applied for a certificate of public convenience and necessity. Under the new certificate, Texland intended to construct and operate in Milam County three generating plants, each producing 500 megawatts of electric power. In support of its application, Texland alleged among other matters that in 1988 LCRA's generating capacity, without Fayette 3, would become insufficient to supply all the electricity that Bluebonnet and Pedernales would require—that being also the year the first proposed Texland plant would commence operation if the Commission approved the Texland application. In another pleading filed in the Commission, Texland conceded that its proposed generation and sale of electric power would place it in competition with LCRA, an apparent admission that the aggregate generating capacity of the three Texland units would be in excess of the anticipated needs of Bluebonnet and Pedernales. The Commission therefore consolidated the proceeding initiated by Texland's application with that initiated earlier by LCRA's application to amend its certificate of public convenience and necessity.

Subsequently, however, Texland moved that the two proceedings be severed, urging that Texland had reached an "agreement in principle" (later reduced to a contract) with Houston Lighting and Power Company that it would purchase all the excess electric power generated by Texland, with the result that Texland and LCRA would *not* be in competition with respect to the sale of electric power to the same potential customers. The Commission overruled the Texland motion, but it expressly did not foreclose the possibility that LCRA *and* Texland might each estab-

1. Appellees in the present appeal are Texland Electric Co., Texland Electric Cooperative, Inc., Bluebonnet Electric Cooperative, Inc., and Pedernales Electric Cooperative, Inc. Texland Electric Cooperative, Inc., a cooperative of which Pedernales and Bluebonnet are the sole members, owns all the capital stock of Texland Electric Co., a corporation organized and existing under the laws of the State of Texas. In the course of the administrative proceedings with which we deal, Texland Cooperative, Inc. originally applied for a certificate of public convenience and necessity, but Texland Electric Co. was substituted as the applicant.

The Public Utility Commission, an appellant here, is a state agency created in PURA § 5. It is given a wide array of administrative powers, both general and specific, including the power "to regulate and supervise the business of every public utility within its jurisdiction"; and "all authority and power of the State of Texas to insure compliance with the obligations of public utilities" set forth in PURA. PURA §§ 16, and 37.

lish an entitlement to what each sought—in the case of LCRA an amendment to its certificate and in the case of Texland the issuance of a new certificate of public convenience and necessity. That is to say, the Commission did not purport to determine that *only* the Fayette County or *only* the Milam County project was required; instead, it expressly left open the possibility that *both* might be required to meet a public need for additional electric power.

After final hearing in the consolidated proceeding, the Commission's hearing officer recommended that the LCRA application be approved and that the Texland application be denied. Agreeing with the former recommendation, the Commission approved the LCRA application.[2] The Commission, declining to determine the applica-

tion of Texland, directed in the same order that the Texland proceeding be severed and remanded for the taking of additional evidence on the following matters: (1) "a firm financing plan for the Texland units"; and (2) the "expertise" with which the Texland units would be constructed, operated, and managed.

After taking additional evidence, the hearing officer made findings of fact and conclusions of law, based upon which he again recommended that the Texland application be denied. In his supplemental report, the hearing officer listed certain findings of fact and conclusions of law and also set forth in narrative and expository form an amalgam of evidence adduced, arguments of the parties, other findings of fact, and other conclusions of law.[3] These re-

2. The portion of the Commission's final order granting the LCRA application was affirmed by the district court on judicial review. In an unpublished opinion, this Court affirmed the judgment of the district court.

3. In its final order of May 20, 1983, the Commission adopted and incorporated the report of its hearing examiner. The report is divided into seven basic sections.

The first six sections are entitled: "Procedural History," "Organization of Report," "Statutory Criteria," "Description of the Project," "Issues on Remand," and "Application of Statutory Criteria." Within each such section there are, variously, a relation of events which occurred in the proceedings, summaries of evidence adduced in the hearings and references to particular pieces of evidence, statements of the arguments raised by the parties, and expository statements of the hearing officer's reasoning in rejecting or accepting arguments and in weighing and giving effect to evidence. Included as well are findings of fact and conclusions of law.

The last section of the report is entitled "Findings of Fact and Conclusions of Law." Under this heading, the report lists 69 "Findings of Fact" and six "Conclusions of Law." Some of these restate findings of fact and conclusions of law made previously in the other six sections of the report. But those preceding sections also contain findings of fact or conclusions of law *not* listed as such in the seventh and last section of the report. Moreover, under the heading "Findings of Fact," the report lists conclusions of law and does not discriminate between findings of basic or underlying fact and findings of ultimate fact. *See generally Miller v. Railroad Commission of Texas,*

363 S.W.2d 244, 245–46 (Tex.1963); *Railroad Commission of Texas v. Graford Oil Corp.,* 557 S.W.2d 946, 950 (Tex.1977); Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases,* 16 Tex.Tech.L.Rev. 475, 476–90 (1985). An example of a finding of basic fact not listed as such by the Commission in section seven of the report is the important finding that "Texland ... has no sources of revenue, and its owners have no sources of revenue other than that derived from the resale of power purchased from LCRA." Another is the finding of intermediate fact that although both Texland and LCRA "have applied for certificates for generating facilities, that is where the similarity [between them] ends."

One of the purposes intended to be served by APTRA § 16(b), and one of the functions of findings of fact and conclusions of law, is to enable a reviewing court to perform its statutory duty of judicial review. *Miller v. Railroad Commission, supra.* The mixing of findings of basic fact and ultimate fact, and their being made directly or indirectly in the course of describing other aspects of the contested case, make difficult the task of judicial review, wherein the court is asked, as it is here, to determine whether the agency's findings of basic fact enable the reviewing court fairly and reasonably to conclude that they support the agency's findings of ultimate fact. *Railroad Commission v. Graford Oil Corp., supra.* This is not, however, to denigrate the helpfulness of a complete statement of the agency's rationale, with evidentiary references, such as we have on the whole in this case. It is to say, however, that a *separate* listing of *all* findings of fact and *all* conclusions of law is extremely helpful.

late both to the evidentiary matters specified in the Commission's order of remand and to the statutory "criteria" listed in PURA § 54 as bearing upon the consideration and determination of applications for certificates of public convenience and necessity. In a final order of May 20, 1983, the Commission adopted the hearing officer's recommendations and denied the Texland application.

## JUDICIAL REVIEW IN THE DISTRICT COURT

Texland sued for judicial review of the order of May 20, 1983. The district court reversed the agency order, having determined that its decision was arbitrary and capricious because certain of the Commission's findings of ultimate fact (its "conclusions and conclusionary findings") were not fairly and reasonably supported by findings of basic fact. APTRA §§ 16(b), 19(e)(6); *Miller v. Railroad Commission,* 363 S.W.2d 244, 245–56 (Tex.1962); *Railroad Commission v. Graford Oil Corp.,* 557 S.W.2d 946, 950 (Tex.1977). The district court held specifically that no findings of basic fact fairly and reasonably supported the Commission's determinations that: (1) Texland should be required to show a financing plan that was "firm" as well as "feasible" while LCRA was required only to demonstrate that its plan was "feasible"; and (2) the risks to Bluebonnet and Pedernales customers, posed by the Texland project, outweighed any benefits they might derive from the project. We will discuss the matter of "risk" as an integral part of the Texland financing plan, for it is interwoven with the "firm" and "feasible" elements of the plan in the reasoning of the agency.

Texland had alleged that the agency order was invalid on other grounds, but the district court did not reach these contentions owing to its determinations as described above.

Contending the district court erred in its holdings, LCRA and the Commission appeal to this Court for the further judicial review authorized by APTRA § 20. Texland does not, on appeal, complain of the district court's declining to determine Texland's complaints that the agency order of May 20, 1983 was invalid on other grounds.

## CERTIFICATES OF PUBLIC CONVENIENCE AND NECESSITY UNDER PURA

We believe it necessary first to set out the statutory provisions which govern the Commission's issuance of certificates of public convenience and necessity. Under PURA § 50, a public utility is forbidden to render service to the public, directly or indirectly, "without first having obtained from the Commission a certificate that the present or future public convenience and necessity require or will require such installation, operation, or extension" as the applicant proposes. The general purpose behind the certification requirement is "to provide for a rational distribution of public utility service within defined geographical areas" so that, within a specific area, the provider of utility service is "unhampered by competitive forces." Toben, *Certificates of Convenience and Necessity under the Texas Public Utility Regulatory Act,* 28 Baylor L.Rev. 1115, 1116 (1976); *see also Amtel Communications v. P.U.C.,* 687 S.W.2d 95 (Tex.App.1985, no writ).

The references in PURA § 50 to *future* public convenience and necessity, and what will be required in that regard, make the certification process subject to the uncertainties that always attend any prediction of economic conditions and factors. Apart from this naked reference to the future, PURA gives "no other indications ... as to how proximate in time the requirements of the public must be before a certificate of convenience and necessity will be issued." Toben, *supra,* at 1124. The necessary implication is, of course, that the futurity aspect of the public convenience and necessity is a matter for administrative judgment based upon the agency's experience and special knowledge, or its "expertise."

Subsection (b) of PURA § 54 provides that the Commission may not issue a certificate unless it "finds that the certificate is

necessary for the service, accommodation, convenience, or safety of the public." The subsection also provides that the Commission may "issue the certificate as prayed for, or refuse to issue it, or issue it for the construction of a portion only of the contemplated system or facility or extension thereof, or for the partial exercise only of the right or privilege."

In § 54(c) we find listed several specific *factors* the Commission *must consider* in arriving at its decision whether a "certificate is necessary for the service, accommodation, convenience, or safety of the public."[4] Those factors are:

(1) the adequacy of existing service;

(2) the need for additional service;

(3) the effect which granting the certificate will have on the applicant and on any public utility of the same kind already serving the proximate area;

(4) the effect of the Commission's decision on:

(a) community values;

(b) recreational and park areas;

(c) historical and aesthetic values;

(d) environmental integrity; and

(e) the probable improvement of service or lowering of costs to consumers.

These "factors" are, of course, stated in the broadest possible terms. They are expressions of the Legislature's policy concerning the granting and amending of certificates of convenience and necessity, in light of the tenor of PURA as a whole. They give the Commission stated objectives toward which to work in that part of its responsibilities pertaining to such certificates. Stated another way, they are legislative *standards* guiding the Commission in its administration of the certificate process. *Texas Antiquities Committee v. Dallas County Community College District*, 554 S.W.2d 924 (Tex.1977); *Key Western Life Ins. Co. v. State Board of Insurance*, 163 Tex. 11, 350 S.W.2d 839 (1961); *Southwestern Sav. & L. Ass'n of Houston v. Falkner*, 160 Tex. 417, 331 S.W.2d 917 (1960); *Housing Authority v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79 (1940).

To implement in particular circumstances such broadly stated legislative objectives and standards, the Commission must necessarily decide what they mean in those circumstances; and because some of them obviously compete *inter se*, the agency may in some cases be required to adjust or accommodate the competing policies and interests involved. For example, a "need" for additional service implies a relative requirement, ranging from an imperative need to one that is minimal; and, if a "need" be sufficiently grave, it may have to prevail notwithstanding an adverse affect upon another interest, such as the environment. Conversely, "environmental integrity" may in some circumstances have to prevail over a need for the additional

---

**4.** Section 54(c) provides:

Certificates of convenience and necessity shall be granted on a nondiscriminatory basis after consideration by the commission of the adequacy of existing service, the need for additional service, the effect of the granting of a certificate on the recipient of the certificate and on any public utility of the same kind already serving the proximate area, and *on such factors as* community values, recreational and park areas, historical and aesthetic values, environmental integrity, and the probable improvement of service or lowering of cost to consumers in such area resulting from the granting of such certificate.

(emphasis added). The expression "such factors as" would *ordinarily* imply that the Commission might consider factors *similar to* those listed after the expression—"community values, recreational and park areas," and so forth. *See* *Board of Adjustment v. Levinson*, 244 S.W.2d 281, 282, 285 (Tex.Civ.App.1951, no writ); *Erwin v. Steele*, 228 S.W.2d 882, 885 (Tex.Civ.App. 1950, writ ref'd n.r.e.). That is rather unlikely, however, in the case of PURA § 54(c). The factors which follow the expression are: "community values, recreational and park areas, historical and aesthetic values, environmental integrity, and the probable improvement of service or lowering of costs to consumers...." Whether under the most mechanical or the most imaginative interpretation, we are unable to ascertain a common aspect in all of these factors, so that a filial relationship between them might be inferred and extended to other *unlisted* factors possessing the same aspect. Therefore, we are content in the present case to list only the factors expressly mentioned in § 54(c).

service. None of the statutory factors is intended to be absolute in the sense that any one shall prevail in all possible circumstances. In making these sometimes-delicate accommodations, the agency is required to exercise its "expertise" to further the *overall* public interest.

 In order to effectuate the general factors expressed in § 54(c), the Commission may find it necessary to specify and employ more *particular* factors, either in an exercise of its rulemaking power *or* in an exercise of its power to determine, in contested cases, the facts upon which depend the applicability of any of the statutory factors. *Housing Authority v. Higginbotham, supra.* The Commission's choice of one method or the other is ordinarily a matter within its discretion. *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *State Board of Insurance v. Deffebach*, 631 S.W.2d 794 (Tex. App.1982, writ ref'd n.r.e.). In ratemaking, for example, the Commission is directed by PURA § 38 to require rates that are just, reasonable, and not unreasonably discriminatory. Of this standard, the Supreme Court of Texas has said:

> This broad standard allows the Public Utility Commission discretion to determine the method of rate design. It also gives the Commission the *discretion* to consider factors other than cost and adjusted values of property. Rate design

is a complex problem that involves many factors.

*Texas Alarm & Signal Ass'n v. Public Utility Comm'n*, 603 S.W.2d 766, 772 (Tex. 1980) (emphasis added). As indicated in *Southwestern Sav. & L. Ass'n of Houston v. Falkner, supra,* the more particular factors considered by the agency must have a reasonable basis in some statutory standard. 331 S.W.2d at 921.

We have briefly discussed the foregoing principles of administrative law because, in the present appeal, the parties' controversy revolves around a particular factor *not* expressly mentioned in § 54(c) as a factor the Commission must "consider" in reaching its determination whether issuance of the certificate "is necessary for the service, accommodation, convenience, or safety of the public." That particular factor, as indicated in the final administrative orders pertinent to the present appeal, is whether "the applicant has established the ability to provide [the] facilities" it proposed to erect if permitted by the Commission to do so. Neither is this consideration a rule-based factor, for the Commission evidently has not promulgated general rules in elaboration of the broad factors that § 54(c) directs the agency to "consider" in its determination whether issuance of the certificate "is necessary for the service, accommodation, convenience, or safety of the public."[5]

---

5. In PURA § 16(a), we note, the Legislature directed that the "[C]ommission *make and enforce rules reasonably required in the exercise of its powers and jurisdiction,* including rules governing practice and procedure before the [C]ommission" (emphasis added). Such rules are beneficial for purposes of fair notice to the parties, judicial review, and administrative consistency in the adjudication of contested cases. No party complains in the present appeal that the Commission has failed to promulgate such rules as they might apply, for example, in the matter of a financing plan by which an applicant proposes to erect an electric-generating facility.

Texland does, however, raise a related issue. In several instances in its brief, Texland complains that it did not know *what* it was required to establish owing to the vagueness of the word "firm," used in the Commission's order of remand for the taking of additional evidence. We think the word "firm" no more vague than the

word "feasible." However, it is not an easy issue that Texland raises in this regard, although it has not done so in a specific way, owing no doubt to Texland's success in the district court on other grounds.

One affected by an administrative proceeding of the kind here in question is entitled to know the issues on which the agency's decision will turn. It is a matter of procedural due process of law, essential to a fair "hearing." *Bowman Trans. v. Arkansas-Best Freight,* 419 U.S. 281, 288 n. 4, 95 S.Ct. 438, 443, n. 4, 42 L.Ed.2d 447 (1974); *Madden v. Texas Board of Chiropractic Examiners,* 663 S.W.2d 622, 626–27 (Tex.App.1983, writ ref'd n.r.e.). One must bear in mind, however, that in the initial proceeding Texland offered no evidence at all as to the manner in which it proposed to finance its intended project. In consequence, the hearing examiner's first report contained a recommendation that Texland's application be denied, partly on the ground that

On motion for rehearing, Texland makes an argument rejected in the *Falkner* case. Texland contends vigorously that the Commission's consideration of an applicant's ability to provide the facilities it proposes to erect is an exercise by the agency of a power not given it by PURA. This is incorrect. The power exercised here is the Commission's power to issue or amend certificates of convenience and necessity. The power is unquestionably given the agency by PURA; indeed, this power was invoked in the agency by Texland itself. The real issue is whether the particular factor in question—an applicant's ability to provide the facilities it proposes to erect—finds reasonable support in the broad factors enumerated in § 54(c).

The Commission *infers* from the terms of PURA § 54 the power to consider whether "the applicant has established its ability to provide the intended facilities ..." We conclude the agency permissibly could derive and consider this subsidiary factor by reasonable inference from the factors listed in PURA § 54 [6] and that it could, in its discretion, do so in a contested case as opposed to doing so by a general

Texland had "no financing plan, and without a basic plan, it is impossible to gauge the effect of financing on the ratepayers or on the total cost of the plant." In other parts of his report, the hearing officer observed that without a financing plan the Commission could not make a determination of the "impact" which granting an application might have on the applicant. And he specifically observed that without a financing plan the "impact" upon Bluebonnet and Pedernales could not be determined, nor could it be determined how any benefits to them "would be passed on to their customers," nor were the tax effects ascertainable. The report specifically pointed out the apparent detriment posed to Bluebonnet and Pedernales by its advances to Texland and that any reciprocal benefits were "at this time ... purely speculative." The hearings officer having made these explicit criticisms of Texland's case, *before* the remand ordered by the Commission, we find no basis for any suggestion of unfairness.

6. The Commission, being a creature of the Legislature, has only the powers conferred upon it by statute. The agency has here inferred from PURA § 54 the power to consider the financing plan, proposed by an applicant, as a factor in determining whether issuance of a certificate to the applicant is "necessary for the service, accommodation, convenience, or safety of the public." The question arises, therefore, whether PURA confers such power upon the Commission. Because the power is not expressly conferred, it must exist by implication if it exists at all.

As a general rule, administrative agencies possess by implication such powers as may be necessary to effectuate the legislative objectives which underlie the administrative powers expressly conferred. *City of Corpus Christi v. Public Utility Commission*, 572 S.W.2d 290 (Tex. 1978). Indeed, in PURA § 16, the Commission is expressly vested with the power "to do all things ... necessary and convenient to the exercise of any specific or implied power" vested in the agency by the terms of PURA. And because administrative agencies are given their statutory powers with a view to achieving legislative purposes more fully and effectively through the agency's specialized judgment, knowledge, and experience, the methods chosen by the agency, and its interpretation of the statute it is required to administer, are entitled to judicial respect. *City of Corpus Christi v. Public Utility Commission, supra; Railroad Commission of Texas v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956); Guinn, *Administrative Law*, 24 Sw.L.J. 216, 221 (1970); Tucker, *Administrative Law and Procedure*, 16 Tex.Tech L.Rev. 1, 14, 38 (1985); annot., 39 L.Ed.2d 942 (1975). We believe the provisions of PURA, to which we have referred in the text, permit the Commission to make the inference it did. It is reasonably drawn from the legislative direction that the Commission consider factors such as "the probable improvement of service or lowering of costs to consumers ... resulting from the granting of the certificate ..." PURA § 54(c). And because the intended method of financing can bear upon the cost ultimately borne by consumers, and the quality of service, as shown by the fact findings in the present case, we believe the Commission could reasonably make the inference in question on those grounds. Further, the inference may reasonably be drawn from the Legislature's express direction that the Commission consider the effect which granting the certificate may have on the applicant, as set out in PURA § 54(c). If the nature of the applicant's financing plan is such as to cast serious doubts, *ab initio*, upon the applicant's probable capacity to complete and successfully operate the intended project, we see nothing in PURA which suggests a rule that the Commission must nevertheless grant the application and await the future date when the failing utility has violated its statutory duty to "render continuous and adequate service," owing to its financial problems, while denying in the interim all other applications to serve the geographical area and its need for utility service of the kind proposed (PURA § 58).

rule.[7] *Securities and Exchange Commission v. Chenery Corp., supra; State Board of Insurance v. Deffebach, supra.* But because this is *not* a factor that PURA *expressly* requires the agency to consider in the certification process, APTRA § 16(b) does not require that the Commission make findings of basic or underlying fact which support its ultimate finding on that factor. That is to say, it is not a "mandatory fact finding set forth in the relevant enabling act," nor is it a factor that "the statute directs the Commission to include ... within its criteria for review ..." *Texas Health Facilities Commission v. Charter Medical-Dallas,* 665 S.W.2d 446, 451 (Tex.1984). The importance of this language in the *Charter Medical* case will appear below. We respectfully request that the Supreme Court reconsider this construction of AP-TRA § 16(b) for it subverts the judicial review process governed by that statute. *See Amtel Communications v. P.U.C.,* 687 S.W.2d at 105–07.

WHETHER THE COMMISSION APPLIED DIFFERENT FINANCIAL-PLAN CRITERIA TO LCRA AND TEXLAND: AND, IF IT DID, WHETHER IT ACTED ARBITRARILY AND CAPRICIOUSLY BECAUSE THE AGENCY'S FINDINGS OF FACT DO NOT SHOW A RATIONAL BASIS FOR THE DISTINCTION

In their appeal, LCRA and the Commission contend the district-court judgment is erroneous because: (1) under the Supreme Court's decision in *Charter Medical,* the Commission was not required to make any findings of basic fact whatsoever in support of its contrary findings of ultimate fact relative to the parties' respective financial plans; and (2) in any event, these contrary findings of ultimate fact *were* shown to have a rational basis in certain findings of basic fact made by the agency which demonstrate that LCRA and Texland *were not similarly situated* in regard to their respective financial strengths and in the kind of financing plan each proposed,

the Texland plan being new to the administrative experience of the agency, more complex, and dependent upon far more interrelated contingencies.

### The Texland Plan

We shall examine first the financing plan intended by Texland for the construction of the three generating units it proposed to build and operate. The plan, conceded by all parties to be a novel one in the Commission's experience, consisted of two parts: the "construction" phase and the "operational" phase. In both parts, the overriding consideration was that Texland would not pledge its general credit to obtain the necessary funds, for it had no credit as a practical matter, being a newly formed corporation with no assets beyond $1000 in paid-in capital. Instead, the funds would be supplied by lenders on the security of project assets and revenues derived from the sale of power generated by the three units, as more particularly described hereafter. We shall discuss the plan in terms of "interim" or construction-phase financing and "long-term" or operational-phase financing.

### Interim Financing

The Texland plan contemplated the formation of a "construction trust, to be administered by a commercial bank or trust company ..." The trust would "purchase the land, equipment and services necessary to construct the project" and would receive "assignment of all contracts related to the project, including" the Houston Lighting and Power Company contract, a contract for furnishing lignite to the three units, "future proposed contracts with" Pedernales and Bluebonnet, and perhaps other contracts. The trust would be empowered to borrow the sums necessary for construction, doing so through a revolving-credit agreement "with a large group of commercial banks." The interest charged on the loans would be capitalized. The agreement would be made attractive to lenders through "a security interest in the trust assets, a sound completion guarantee from

---

7. See discussion under fn. 4 above. We assume here, in the absence of any contention to the contrary, that no agency rules were "reasonably required" under PURA § 16(a).

the project beneficiaries [evidently Pedernales and Bluebonnet, for Houston Lighting and Power Company had refused to give such a guarantee] and [an] operational assurance from" a "consortium" composed of Westinghouse Electric Company, Combustion Engineering, Inc., H.B. Zachary Company, and Wheelabrator Frye, Inc. "Shearson/ American Express," which developed the proposed plan, would assist Texland in obtaining the bank commitments for the interim financing on terms "favorable to Texland." Approximately $2.2 billion in interim financing would be required.

The Commission found that the interim-financing portion of the Texland plan was neither "firm" nor "feasible." As used by the hearing officer in his report and by the parties on appeal, the want of "firmness" attributed to the Texland plan refers variously to a lack of specificity, a lack of completeness, a lack of finality, or a failure of proof. This sense of the word "firm" is illustrated by findings of basic fact to the effect that: (1) Texland "failed to show that the risk of lost revenues due to construction delays will not be borne by Texland ... or its owners"; (2) "a sound completion guarantee is required before interim lenders will invest in the project, and no such guarantee exists as of this date"; (3) "[w]ithout a completion guarantee, it is impossible to evaluate the price interim lenders will extract in return for their investment"; (4) "[i]n order to obtain interim financing, the lenders will require assurances that firm [long-term] financing can be obtained"; and (5) "[n]o evidence as to feasibility has been presented and [Texland's] own criteria for such financing has not been met."

The hearing officer's report explains the Commission's rationale in reaching its findings of ultimate fact that the Texland plan was not shown to be either "firm" or "feasible." The rationale is chiefly that interim lenders would require both a completion guarantee and "assurances" that sums obtained through long-term financing would be available to pay off the debts incurred by Texland for interim financing; and,

without these, the interim-financing was neither "firm" nor "feasible." This corresponds, of course, with the findings of basic fact mentioned above; and although they are not attacked as being without substantial evidence to support them, we observe in the testimony sufficient evidence to support a conclusion that the findings were the product of reasoning from the evidence adduced.

### Long-term Financing

The long-term financing contemplated in the Texland plan also consisted of two parts. A portion of the long-term financing would be obtained through the issuance of $550 million in pollution-control bonds, while the remainder would be obtained through a "leveraged lease" of each generating unit, commencing with the completion of each such unit.

Pollution-control bonds would be issued by a river authority during the construction phase and in three separate offerings timed "so that the market can digest the offerings more easily," but probably one year apart. While the bonds would be issued by a river authority, they would also represent an obligation of Texland. (The particulars of this arrangement are not specified.) Texland intended to make the bonds more marketable by obtaining a letter of credit issued by a commercial bank, guaranteeing Texland's payment of principal and interest.

The balance of the long-term financing would be furnished under a "leveraged lease" arrangement applicable to each generating unit. "The leverage lease plan contemplates an equity participant and long-term lenders, the proportion of which will be determined by [a] computer model." Those who furnish such long-term funds would become the owners of the unit from whom Texland would lease the unit, paying rent "in an amount sufficient to pay principal and interest on borrowed funds and a minimal amount to the equity investors who under the leveraged lease require only cash benefits barely in excess of their investment," owing to the fact that "a large

part of their compensation derives from the tax benefits they receive."

The Commission's findings of fact (some of which we glean from the explanatory portions of the hearing examiner's report), pertaining to the long-term-debt financing portion of the Texland plan, may be summarized as follows:

Under the Texland plan, it is intended that power generated from the three units will be sold to Pedernales, Bluebonnet, and Houston Lighting and Power Company, thereby furnishing the revenue to cover Texland's cost of production and the service of its long-term debt under its "leveraged leases" and pollution-control bonds. The Commission found, however, that the sufficiency of such revenues to cover these obligations could not be determined in the case for two reasons: (1) there was no contract with Bluebonnet and Pedernales under which they would purchase power generated from the three plants; and (2) under the Houston Lighting and Power Company contract, it would be obligated to pay nothing if service were interrupted and Texland had not shown "a mechanism" by which it would establish a "reserve" to meet this contingency.

Concerning Texland's intention to rely upon pollution-control bonds for a portion of its long-term financing, the Commission found: (1) there was no evidence that a river authority had been approached or had agreed to issue such bonds "in behalf of" Texland, and no evidence that any "financial institutions" had been approached or had agreed to issue letters of credit to "back" such bonds, a concomitant part of the Texland plan; (2) the "revenue assurances," shown to be required for interesting investors in the bonds, could not be met under the Texland plan because of the absence of a "reserve" meeting the contingency in the Houston Lighting and Power Company contract and because Texland had no contract with Pedernales and Bluebonnet requiring them to purchase electric power from the three units; and, (3) Texland produced no evidence that pollution-control bonds of the contemplated magnitude can feasibly be let by a river authority, in behalf of Texland, especially in light of its financial condition and its status as a new "entrant into the generation field."

Texland intended to derive the balance of its long-term financing by, in effect, leasing the three units. The Commission found that the feasibility of this aspect of the Texland plan could not be determined because: (1) it depends in large part upon the attractiveness of tax benefits to the investors who would purchase the units and lease them to Texland; (2) such tax benefits could not be determined more than one year in advance of the commercial operation of the unit; (3) the investors purchasing the first such unit would not commit to the purchase more than one year in advance and probably not at all until commitments had also been obtained for the remaining two units, implying an overall and inherent defect in the plan which called for the three units to commence operation in successive stages; (4) if Texland purchased a unit at the expiration of any particular lease, Texland's customers would "essentially" have paid twice for the unit, first through the lease payments and again at the time of purchase; and, (5) conversely, if Texland did not purchase the units, its customers would, at the expiration of the lease, be left without a source of electric power.

Finally, the Commission made several findings of basic fact that bore upon the agency's finding of ultimate fact that the Texland plan posed risks to the customers of Bluebonnet and Texland, which risks outweighed on balance any intended benefits they would derive under the plan: (1) any benefit derived by construction of the units at present and presumably lower costs was speculative and not "quantified" by evidence, nor was it shown that this benefit was greater than the detriment posed by the fact that the customers would take energy from the units for only about two-thirds of their useful lives; (2) Texland did not show how any lower-cost savings attending the purchase of power from the three units "would be channeled" from

Texland to the customers of Bluebonnet and Pedernales, nor was it shown whether the tax-exempt status of Bluebonnet and Pedernales would be adversely affected thereby; (3) the Texland plan had already exposed the customers of Bluebonnet and Pedernales to financial risks because the two utilities had loaned Texland $2.6 million and had guaranteed a $6.8 million loan obtained by Texland from another lender, and they had guaranteed as well Texland's performance of a lignite-purchase contract; and (4) such customers were also exposed to a potential risk by Bluebonnet's and Pedernales' execution of a "memorandum of understanding" which, if it culminated in a contract, would require Pedernales and Bluebonnet to pay their share of existing LCRA debt service even after they left the LCRA system.

### The LCRA Financing Plan

Under the financing plan proposed by LCRA, it would issue and sell its own tax-exempt revenue bonds in the total amount of $1,260,000,000, paying therefrom the costs of the issue and the costs of constructing a generating plant fueled by lignite from a nearby mine operated by LCRA. Similar bonds previously had been successfully issued by LCRA to pay for the construction of two earlier and similar power-generating projects in the same vicinity. In addition to findings of basic fact to this effect, the Commission found: (1) the LCRA plan would not have an adverse effect on its bond rating; (2) the increase in customer costs to service the bonds would be implemented in a reasonable way under a "worse case" (sic) assumption; (3) the date of entry into the bond market was flexible; and (4) while factors exist which might affect the interest payable on the bonds, there was no evidence that they would preclude a reasonable interest rate.

### The Application of Different Requirements To Texland as Opposed To LCRA

Turning now to the basic dispute between the parties, we observe from the record that in the original consolidated proceedings both Texland and LCRA were required to show that their respective financing plans were "feasible." When the Commission, in its remand of the Texland application, ordered the taking of additional evidence on certain matters, it directed the taking of evidence on whether the Texland financing plan was "firm," a requirement not imposed upon LCRA because the Commission adopted the hearing examiner's recommendation that the LCRA application be approved. After remand, the hearing officer received additional evidence relative to the Texland financing plan, ultimately to conclude in a supplementary report that the financing plan proposed by Texland was neither "firm" nor "feasible." In denying the Texland application, the Commission adopted the findings of fact and conclusions of law prepared by its hearings examiner.

### HOLDINGS

We hold first that the Commission was not obliged, under *Charter Medical,* to make any findings of basic fact in support of those findings of ultimate fact wherein the agency made different determinations on the respective financing plans of LCRA and Texland. Such explanatory and supportive findings are required by APTRA § 16(b), as construed in *Charter Medical, only* when the constitutive statute in question (PURA here) expressly directs that an agency must make a specific finding of ultimate fact before issuing or refusing to issue a certificate, as the case may be, or when a finding of ultimate fact made by the agency "represents" a criterion which the statute expressly directs the agency to "consider" in its review of the application. *Texas Health Facilities Commission v. Charter Medical-Dallas,* 665 S.W.2d at 451. This is *not* the case under PURA. That statute does *not* expressly require that the Commission make a finding on the feasibility or firmness of a proposed financing plan before issuing or amending a certificate of public convenience and necessity, *nor* does anything in PURA *expressly require* that the agency "consider" such a plan in its review of an

application to obtain or amend a certificate of that kind.

The *Charter Medical* holding remains true even when a given criterion is obviously applied differently as between two applicants, for in *Charter Medical* a "public need" was determined *from the same evidence* to exist for two applicants but not a third, when all three proposed to place their facilities in the same vicinity and offer substantially the same health-care services, plainly demonstrating that the term "public need" was not construed to mean the same thing for both the winning and losing applicants.

Therefore, following the unequivocal and specific holding of *Charter Medical*, we are obliged to hold the trial court erred in setting aside the agency order in this case on the ground that no findings of basic fact demonstrated a rational basis for the different requirements applied to Texland as compared to LCRA. No such findings were required under the Supreme Court's holding in *Charter Medical*.

■ We hold next that any error in imposing the two different requirements was harmless. Various findings of fact conclude that the Texland financing plan was *neither* "firm" *nor* "feasible" on the whole or in various particulars. For example, the Commission found that no evidence had been adduced to show that a river authority had been contacted about issuing pollution-control bonds for the benefit of Texland, or that a bank had agreed to issue its letter of credit in that regard, even though these would be required in order to obtain a large portion of the long-term financing contemplated in the Texland plan. And due to the absence of a completion guarantee and "assurances" of long-term financing, the Commission found that interim lenders would be reluctant to furnish construction financing. While it is possible to argue that these findings, and others like them, imply a want of concreteness or "firmness" in the Texland plan, it is equally logical to view them as bearing upon the feasibility of that plan, which Texland concedes was a novel one with which the Com-

mission had no experience. On balance, we cannot say that the Commission's findings of ultimate fact, relative to the *feasibility* aspect of the interim and long-term financing arrangements contemplated by the Texland plan, are not fairly and reasonably supported by the agency's findings of basic fact, so that the absence of any additional finding of ultimate fact, relative to a want of *firmness* in the Texland plan, is immaterial. *Miller v. Railroad Commission, supra; Railroad Commission v. Graford Oil Corp., supra.*

Even if we are mistaken in this regard, however, we conclude that the Commission's findings of basic fact *do* demonstrate a rational basis for requiring the additional element of "firmness" relative to Texland's proposed financing plan.

The expository portion of the examiner's report explains the agency's rationale; and the findings of fact and conclusions of law stated therein must be understood in the context of the case where, in the words of the report, "any investigation which does not include both the issues of feasibility and the cost of financing falls short of the statutory mark and results in the Commission's leaving final certification decisions in the hands of the financial market place." While we do not necessarily agree with the generality and all the implications of this statement, the following demonstrates its application to Texland:

> Such a concern is particularly important when as in this case, the applicant is a new entrant attempting a $3 billion financing with assets of $1000, owned by two cooperatives with assets of $120 million, all of which are pledged to [a lender], whose sole revenues through the course of the proposed project derive from the sale of power generated by the facilities to be financed. Texland ... is not an ongoing [sic] generating entity with revenues produced from other sources and a financing and credit history. It is attempting to construct a massive project by innovative techniques in financing, construction, operation and maintenance. Partly because of the in-

novation involved, made necessary by the unavailability of traditional financing methods, the Commission must examine the project closely, because some entity must bear the risks associated with the project, and if that entity must be Texland ... and its owners, the Commission must be shown that the costs will be reasonable before those costs are incurred.

In short, the two applicants, LCRA and Texland, were not similarly situated, under the Commission's findings, for LCRA had successfully financed two previous and similar projects by the same method as that contemplated in the present case, and Texland had no experience in such matters, no credit history, and proposed a complex and innovative technique of financing burdened by many contingencies.

 There is no unlawful discrimination in licensing when the issuer makes classifications or exemptions based upon real and substantial differences that have a relationship to the objectives and purposes of the pertinent statute, and applies the exemptions equally to all within the same class. *Railroad Commission v. Miller,* 434 S.W.2d 670 (Tex.1968); *Dodgen v. Depuglio,* 146 Tex. 538, 209 S.W.2d 588 (1948); *Hurt v. Cooper,* 130 Tex. 433, 110 S.W.2d 896 (1937); *Reed v. City of Waco,* 223 S.W.2d 247 (Tex.App.1949, writ ref'd). It follows that the action of the Commission here cannot be "arbitrary or capricious" if the agency's findings of fact have the result of assigning LCRA and Texland to different classes, based on real and substantial differences that have a relationship to the objectives and purposes of PURA, and within each class the parties are treated alike. We believe the agency's findings of fact have that tenor and effect here where one applicant (LCRA), because of its previous successful experience, was excused from a requirement of showing a "firm" financing plan on the ground that it proposed essentially the same financing plan with regard to essentially the same kind of facility in the same vicinity. On the

other hand, under the agency's findings of fact, the other applicant (Texland) proposed a financing plan having real and substantial differences that bore upon the statutory purposes of PURA as we have discussed earlier in this opinion. We therefore hold it was not "arbitrary" or "capricious" of the Commission to require of Texland an additional showing of concreteness relative to its proposed plan of financing, and the grounds for the different requirements are justified by findings of basic fact showing that the two applicants were not similarly situated in regard to a matter within the purposes underlying the licensing provisions of PURA.[8]

**REMAND**

Consequently, we find that the district court erred in reversing of the Commission's order on the grounds stated in the district-court judgment. Appellants raise other points on appeal, but we need not consider them in view of our holdings above. On the other hand, Texland alleged in its original petition in the district court certain other grounds upon which it contended the agency order was invalid. These other grounds chiefly raise questions of law that are within our power to determine on appeal. *Humble Oil & Refining Co. v. Railroad Commission,* 94 S.W.2d 1197, 1199 (Tex.App.1936, writ ref'd). We have concluded, however, that we should not exercise that power because the other grounds alleged by Texland raise issues better determined after a full-scale presentation before the district court, as opposed to additional briefing here followed by appellate argument. We therefore reverse the judgment below and remand the case to the district court for proceedings not inconsistent with this opinion.

8. See fn. 5, *supra.*