IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-147-CV





PEDERNALES ELECTRIC COOPERATIVE, INC., GUADALUPE VALLEY


ELECTRIC COOPERATIVE, INC., NEW BRAUNFELS UTILITIES,


DE WITT COUNTY ELECTRIC COOPERATIVE, SAN BERNARD


ELECTRIC COOPERATIVE, INC., THE CITY OF SAN MARCOS,


AND ITS AGENT, ELECTRIC UTILITY BOARD, 



 APPELLANTS


vs.





PUBLIC UTILITY COMMISSION OF TEXAS,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT



NO. 472,390, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING



 





 Appellants (1) are wholesale customers of the Lower Colorado
River Authority (LCRA) that challenge a rate design decision of the
appellee Public Utility Commission (PUC or the Commission). In
Docket No. 8400, the Commission refused to reinstate a voltage
differential between 138 kilovolt ("kV") customers and 69 kV
customers. The voltage differential had been collapsed as a result
of the Commission's order in an earlier rate case. Application of
Lower Colorado River Authority for Authority to Change Rates,
Docket No. 8032, 14 P.U.C. Bull. 1566 (Sept. 22, 1988). Appellants
sought judicial review of the Commission's decision in the district
court of Travis County, which affirmed the Commission on all
points. From that final judgment, appellants appeal to this Court.

 Appellants complain that the district court erred in
affirming the order of the Commission because by its decision the
Commission treated two groups of customers alike, even though the
evidence and Commission findings determined that they were two
distinct classes; thus, the Commission violated the anti-discrimination provision of the Public Utility Regulatory Act
("PURA"), Tex. Rev. Civ. Stat. Ann. art. 1446c, § 38 (Supp. 1991). 
In addition, they argue that the PUC violated the Texas
Administrative Procedure and Texas Register Act ("APTRA") either
because its findings of fact were not based on substantial evidence
or because its decision was arbitrary and capricious. See Tex.
Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(5), (6) (Supp. 1991). 
They also assert that the Commission violated APTRA by failing to
include required underlying fact findings and by basing its
decision on a vote trade between two Commissioners. See APTRA
§§ 16(b); 19(e)(3) (Supp. 1991). One appellant urges that the
Commission erred in refusing to allow it to present rebuttal
testimony. We will affirm the judgment of the trial court.



The Controversy

 LCRA sells electricity at wholesale to forty-four
customers of varying size. These customers take delivery at
voltage levels of 138 kV, 69 kV, and 12.5 kV. The interests of
12.5 kV customers are not in issue. The controversy centers on
whether the LCRA should be allowed to continue treating wholesale
customers which receive electricity at 138 kV and 69 kV levels as
members of one customer class. 

 Because it is easier and more economical to transport
electricity at high voltage levels, the low voltage electricity
generated by LCRA is transformed to higher voltage levels through
a "step-up transformer." LCRA uses transmission and
subtransmission levels of 345 kV, 138 kV, and 69 kV. Electricity
that is transmitted on the 345 kV lines must be "stepped down" to
the lower voltage lines at which its customers take delivery. All
of LCRA's 345 kV lines are connected directly to 138 kV
transformation facilities. Some LCRA customers take delivery at
this level. The electricity delivered at the 69 kV level must go
through additional LCRA-owned transformation facilities to step the
electricity down to the level at which the customer can receive it. 
 In 1985, the Commission approved a rate design based on
a voltage differential that established one charge for delivery at
the 69 kV level and a lower charge for delivery at the 138 kV
level. Application of Lower Colorado River Authority for Authority
to Change Rates, Docket No. 6027, 11 P.U.C. Bull. 125 (June 10,
1985). In LCRA's next rate case, the parties entered into a
stipulation that provided for the continuation of the voltage rate
differential. Application of Lower Colorado River Authority for a
Rate Increase, Docket No. 7512, 14 P.U.C. Bull. 156 (Oct. 22,
1987).

 In a still later rate case, LCRA requested that the
differential be continued unchanged. Application of Lower Colorado
River Authority to Change Rates, Docket No. 8032, 14 P.U.C. Bull.
1566 (Sept. 22, 1988). An intervenor, Bluebonnet Electric
Cooperative, Inc. ("Bluebonnet"), requested that the voltage
differential between 138 kV and 69 kV be collapsed so there would
be one delivery rate for both 138 kV customers and 69 kV customers. 
LCRA did not present testimony refuting Bluebonnet's position. The
Commission ordered the voltage differential collapsed for rate
design purposes. 

 Forty-two days after the Commission ordered the voltage
differential collapsed in Docket No. 8032, LCRA filed Docket 8400,
from which this appeal arises. Application of Lower Colorado River
Authority for Authority to Change Rates, Docket No. 8400, 15 P.U.C.
Bull. 969 (July 11, 1989). In Docket No. 8400, much of the
evidence regarding rate design focused on the terms of a
stipulation sponsored by the majority of the parties. The
stipulation would have implemented a transmission-facilities credit
in place of a voltage differential as a means of compensating the
138 kV customers on LCRA's system. The hearing examiner
recommended rejection of the stipulation due to lack of time for
its full evaluation. The Commission adopted that recommendation
but rejected the hearing examiner's recommendation to reinstate the
voltage differential. Instead, the Commission decided that LCRA
should retain the voltage differential collapse ordered in Docket
No. 8032 to maintain consistency in LCRA's rate design.

 The Commission's order adopted the hearing examiner's
report, with some modifications, and made the report part of its
order. The controversy in the present cause centers around finding
of fact no. 59, concerning the voltage differential. As
recommended in the examiner's report, finding of fact no. 59 would
have reinstated the voltage differential and would have
substantiated the reasons for the reinstatement in considerable
detail. Her report suggested the following:



59. The voltage level differential between 69 kV and
138 kV transmission lines should be reinstated,
because as discussed in Section IV.C.3 of this
Examiner's Report, the evidence establishes that:

 

 a. The 138 kV and 69 kV lines do not carry out the
same function;


 b. Over 95 percent of the power generated by LCRA
is fed into the transmission system at the 138
kV level or above;


 c. 69 kV lines primarily serve the function of
carrying from the high voltage lines to
customers at the distribution level;


 d. The 69 kV lines serve as a link to the end-use
customers, a function that could be classified
as subtransmission;


 e. LCRA transmission system reliability is not
dependent on the 69 kV lines;


 f. Because the fixed costs associated with the
construction and maintenance of the 69 kV
subtransmission system are not costs
necessarily incurred by LCRA's 138 kV
customers, those costs should not be borne by
138 kV customers;


 g. During normal operations, power generated at
the 345 kV and 138 kV transmission levels flows
through the high voltage transmission
facilities to the 69 kV transmission facilities
to supply power at the distribution level;


 h. Even though the LCRA transmission system is an
integrated network there is a limit as to how
much the 69 kV system is actually integrated,
primarily because the 69 kV system cannot even
begin to serve the magnitude of loads the 138
kV system supports; 


 i. As demonstrated by a miles-of-use analysis, the
use of the 69 kV system is significantly less
than the 138 kV system; and


 j. Load flow changes have only a very minor impact
on the 69 kV system.



 Instead, the Commission rejected the above recommendation
and substituted the following in its final order:



J. The Commission amends Finding of Fact No. 59 to read
as follows:

 

 59. Even though the evidence supports the fact that
it would be reasonable to reinstate the voltage
level differential between the 69 kV and 138 kV
transmission lines, the voltage level collapse
ordered in Docket No. 8032 should be retained,
in order to maintain consistency in LCRA's rate
design.



 Appellants focus their attack on the Commission's finding
of fact no. 59 on three grounds. First, they argue that the first
clause is an implied finding that the voltage differential should
be reinstated and that, therefore, either the Commission's finding
of fact no. 59 was not supported by substantial evidence or its
decision was arbitrary and capricious. Second, they argue that
finding of fact no. 59 was not accompanied by underlying findings
of fact, and thus violated § 16 of APTRA. Finally, they argue that
finding of fact no. 59 is but a post hoc rationalization for the
real basis of the Commission's decision -- a vote trade -- and that
the decision is thus void because it is arbitrary and capricious,
or because it was reached by an illegal procedure.



Finding of Fact 59 Does Not Constitute A Finding that 69 kV
Customers and 138 kV Customers Are Different Classes of Customers.


 Finding of fact no. 59 begins, "[e]ven though the
evidence supports the fact that it would be reasonable to reinstate
the voltage level differential between the 69 kV and 138 kV
transmission lines . . . ." Appellants argue that this clause and
parts of the hearing examiner's report as adopted into the
Commission's order amount to an implied Commission finding that 69
kV and 138 kV users constitute different classes of customers. If
the Commission so found, then appellants argue further that
retention of the voltage collapse violates § 38 of PURA, which
provides that "[r]ates shall not be unreasonably preferential,
prejudicial, or discriminatory, but shall be sufficient, equitable,
and consistent in application to each class of consumers." PURA
§ 38. If substantial differences exist, it is possible that an
unreasonable application of the same rates may be discriminatory. 
Amtel Communications v. P.U.C., 687 S.W.2d 95, 109 (Tex. App. 1985,
no writ). 

 The quoted clause from finding of fact no. 59 is not an
implied finding that 69 kV consumers and 138 kV consumers are two
distinct classes of consumers within the meaning of § 38. In the
context of the final order, this clause represents no more than the
Commission's failure to find that the differential should be
reinstated. 

 In its final order adopting the hearing examiner's
report, the Commission specifically rejected the portion of section
IV.C.3 that covers the voltage differential issue to the extent
that it is inconsistent with the modification of finding of fact
no. 59. Appellants' contention that, by adopting parts of Section
IV.C.3 the Commission also adopted the sections supporting the
differential, is unpersuasive. Had the Commission meant to adopt
evidence and findings supporting the differential, it need not have
specified which parts of Section IV.C.3 it was adopting; it could
have adopted it in its entirety.

 In addition, conclusion of law no. 10, by finding that
the order is consistent with § 38, contradicts the argument that,
by implication, the Commission found that two separate classes
existed. Conclusion of law no. 10 tracks the language of § 38:



The rates which result from the Commission's Order are
just and reasonable; are not unreasonably preferential,
prejudicial, or discriminatory; and are sufficient and
equitable if consistently applied within each class of
consumers as required by Section 38 of PURA.



By adopting both finding of fact no. 59 and conclusion of law no.
10, the Commission reiterated its judgment that 69 kV customers and
138 kV customers are not different classes within the meaning of
PURA § 38. (2)



Finding of Fact No. 59 Was Supported by Evidence; The Commission's
Decision Was Not Arbitrary or Capricious.

 Findings of fact are similar to answers of a trial judge
or a jury to controlling fact issues in a case. Railroad Comm'n v.
Palmer, 586 S.W.2d 934, 937 (Tex. Civ. App. 1979, no writ);
Imperial Am. Resources Fund, Inc. v. R.R. Comm'n, 557 S.W.2d 280,
286 (Tex. 1977).

 The disputed clause here in question is similar to a
jury's failure to find a particular fact, and has the same
consequence. Appellant had the burden to convince the Commission
that the status quo -- the differential collapse -- was
discriminatory under § 38. Finding of fact no. 59 indicates that
the Commission refused to find from the evidence that 69 kV and 138
kV customers constitute two different classes; it means that the
appellants failed to carry their burden of proof on this issue. 
See C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 194 (Tex.
1966).

 Because it represents the Commission's failure to find,
the first clause of finding of fact no. 59 is superfluous: APTRA
§ 16 (b) requires the Commission only to state those findings that
support its ultimate findings; it is not required to state facts
that it rejected and upon which it did not rely in reaching its
conclusions. State Banking Bd. v. Valley Nat'l Bank, 604 S.W.2d
415, 419 (Tex. Civ. App. 1980, writ ref'd n.r.e.). Nevertheless,
we will address appellants' contentions that finding of fact no. 59
is either not reasonably supported by substantial evidence as
required by APTRA § 19(e)(5) or is arbitrary and capricious as
proscribed in APTRA § 19(e)(6). 

 Appellant San Marcos, in its second point of error,
argues that there was "no evidence" to support finding of fact no.
59. "No evidence" generally refers to the rules of review that
bind an appellate court when it considers certain legal sufficiency
points in civil and criminal cases. See Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 Texas L. Rev. 361
(1960). For most agency decisions in contested cases3, however,
the scope of review is specified in APTRA § 19(e). 

 We interpret the contention of San Marcos to be a
complaint that finding of fact no. 59 is not reasonably supported
by substantial evidence as required by APTRA § 19(e)(5). To
determine whether an agency's finding is supported by substantial
evidence we must determine whether, in considering the record upon
which the decision is based, the evidence as a whole is such that
reasonable minds could have reached that finding. Texas State Bd.
of Dental Examiners v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988),
cert. denied, 490 U.S. 1080 (1989); Texas Health Facilities Comm'n
v. Charter Medical-Dallas, Inc. 665 S.W.2d 446, 453 (Tex. 1984). 

 The examiner's report, adopted as part of the agency's
order, describes the issue as hotly contested: "[t]he record is
replete with arguments for and against continuing the collapse." 
Finding of fact no. 59 acknowledges that it would be reasonable to
treat the 69 kV and 138 kV customers differently; the record also
reveals that the commission had a reasonable basis for refusing to
change its policy of treating the 69 kV and 138 kV customers as one
class of customers for rate design purposes. LCRA, the General
Counsel of the PUC, and Bluebonnet all introduced evidence in
support of retaining the collapse. 

 According to the testimony in the record, LCRA delivers
power through interconnected facilities which are necessary to
transfer energy from the point of generation to the customers'
distribution load centers. LCRA engineer Brad Belk testified that
delivery of its power at different voltage levels does not warrant
different rate treatment:



Power flows from generators to loads over any and all
electrical paths available to it. Power can and does
move back and forth between the different voltage levels. 
The 69 kV portion of LCRA's transmission system is
operated in exactly the same way as the 138 kV and 345 kV
portions of the system and is electrically parallel
. . . . All LCRA customers make some use of the
transmission lines at all three voltage levels regardless
of the voltage level at which they take delivery.



The Commission's General Counsel agreed that the voltage
differential, as historically designed and applied in LCRA's rates,
was not the appropriate mechanism for compensating customers who
own transmission facilities. 

 Bluebonnet's witness argued that the 138 kV and 69 kV
transmission lines form a transmission network and that the 69 kV
network operates with and supports the 138 kV network. He also
stated that the 69 kV and 138 kV systems serve the same function: 
"[F]or a change external to LCRA's transmission system, as well as
for a change internal to LCRA's transmission system, all of LCRA's
transmission system is impacted . . . therefore, the 69 kV and 138
kV systems are functionally the same." Because the 138 kV lines
and 69 kV lines perform the same function of transmitting bulk
power from LCRA's generators to its load centers, and because the
138 kV and 69 kV lines are all tied into the same transmission
system, all LCRA customers should bear the costs associated with
operating the 138 kV lines and 69 kV lines equally according to
this witness. 

 Appellants also attack the Commission's decision as
arbitrary and capricious. See Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19 (e)(6). They argue that, by establishing a new class for
the University of Texas Balcones Research Center (Balcones), based
on "reasonable load characteristic and cost of service reasons,"
the Commission was also obliged to create different classes for 69
kV and 138 kV customers based on cost of service. 

 Review under the "arbitrary and capricious" standard is
limited and deferential. Examples of conduct that have been found
to be arbitrary and capricious include: basing a decision on
legally irrelevant factors or failing to consider statutorily-mandated relevant factors in making an agency's decision, Consumers
Water v. Public Util. Comm'n of Texas, 774 S.W.2d 719, 721 (Tex.
App. 1989, no writ); granting a certificate of service to a public
utility for a reason other than the statutorily defined reasons,
Public Util. Comm'n of Texas v. South Plains Elec. Coop., 635
S.W.2d 954, 957 (Tex. App. 1982, writ ref'd n.r.e.); in denying a
permit, relying on additional requirements neither expected by
applicant nor proposed by staff, Starr Co. v. Starr Indus. Serv.
Inc., 584 S.W.2d 352, 355 (Tex. App. 1979, writ ref'd n.r.e.).

 In this case, the Commission did not act arbitrarily or
capriciously. PURA grants the Commission considerable discretion
in deciding rate design issues. Texas Alarm & Signal Ass'n v.
Public Util. Comm'n, 603 S.W.2d 766, 772 (Tex. 1980). So long as
the Commission addresses the rate considerations set by PURA, the
particular factors and the weight to be given those factors are
within the Commission's discretion. Public Util. Comm'n v. AT&T
Communications, 777 S.W.2d 363, 366 (Tex. 1989); Texas Alarm &
Signal, 603 S.W.2d at 772-73. 

 Under PURA § 38, the Commission may establish classes of
customers and set differing rates for such classes so long as the
rates are not unreasonably discriminatory as to a particular class
of customers. Texas Alarm & Signal, 603 S.W.2d at 770 (emphasis
added.). Further, the Commission may consider a variety of factors
in making rate design decisions. See Texas Alarm & Signal, 603
S.W.2d at 772. Appellants focus on cost differences, arguing that
if cost justified the creation of Balcones as a separate class,
then cost also should have justified treating 69 kV and 138 kV-users as different classes. However, the Commission also cited
Balcones's load factor as a reason for treating it as a separate
class. The Commission's decision to create a separate class for
Balcones at the same time that it retained the voltage collapse was
not arbitrary or capricious.



The Commission's Finding was not Statutorily Required.


 Appellants also complain that the trial court erred in
failing to find that the PUC acted arbitrarily and capriciously by
failing to include underlying facts supporting finding of fact no.
59. Essentially, they argue that the fact findings are inadequate
under APTRA § 16(b), which provides in relevant part that
"[f]indings of fact, if set forth in statutory language, must be
accompanied by a concise and explicit statement of the underlying
facts supporting the findings." Appellants complain that finding
of fact no. 59 was not accompanied by a statement of its underlying
facts and failed to meet the requirement that findings of fact be
non-conclusory and specific. See Charter Medical, 665 S.W.2d at
451.

 It is important to distinguish between ultimate findings
of fact and the basic facts underlying the ultimate findings:



An ultimate finding is a conclusion of law or at least a
determination of a mixed question of law and fact. It is
to be distinguished from the findings of primary,
evidentiary, or circumstantial facts, which constitute
the "basic" facts. Facts of a basic or underlying nature
are reached from a consideration of the evidence in the
record. From these basic facts the ultimate facts,
usually in the language of the statute, are to be
inferred.



Shannon and Ewbank, The Texas Administrative Procedure and Texas
Register Act Since 1976 -- Selected Problems, 33 Baylor L. Rev.
393, 409 (1981) (footnotes omitted). See also Powers, Judicial
Review of the Findings of Fact Made by Texas Administrative
Agencies in Contested Cases, 16 Tex. Tech L. Rev. 475 (1985).

 Although labelled "finding of fact," amended finding of
fact no. 59 is more accurately described as an ultimate finding or
a conclusion of law because it clearly implies the Commission's
exercise of "discretion or judgment . . . based on a multitude of
factors." See Lewis v. Gonzales County Sav. and Loan Ass'n, 474
S.W.2d 453, 457 (Tex. 1971). 

 We will reject appellants' contentions because underlying
fact-findings are not required in the present cause. Charter
Medical and the cases following are unequivocal: § 16(b) mandates
underlying fact-findings only for statutorily required findings: 
"we hold that section 16(b) of the APTRA requires an accompanying
statement of underlying facts only when the ultimate fact finding
embodies a mandatory fact finding set forth in the relevant
enabling act." Charter Medical, 665 S.W.2d at 451. Thus, when an
agency makes ultimate findings that are not statutorily required,
no underlying findings are necessary. Id.; see also Imperial Am.,
557 S.W.2d at 286; Galveston County v. Texas Dept. of Health, 724
S.W.2d 115, 125 (Tex. App. 1987, writ ref'd n.r.e.) (because the
relevant enabling act does not require the Department to make any
particular findings of ultimate fact before issuing a permit, the
Department was not obliged to make any findings of basic fact at
all by reason of § 16(b) under the holding of Charter Medical);
Public Util. Comm'n v. Texland Elec. Co., 701 S.W.2d 261, 269 (Tex.
App. 1985, writ ref'd n.r.e.). 

 A "finding of fact set forth in statutory language," is
either a mandatory finding set forth in the relevant enabling act,
or a finding that represents a criterion the legislature has
directed the agency to consider in performing its function. 
Charter Medical, 665 S.W.2d at 451; Consumers Water, 774 S.W.2d at
722.

 "Consistency" as used in finding of fact no. 59 does not
represent a mandatory finding set forth in the enabling act or a
criterion that the legislature has directed the agency to consider. 
PURA contains only one reference to "consistency" -- the provision
of § 38 discussed above. We conclude that the "consistency"
referred to in finding of fact no. 59 is consistency in rate design
between dockets, rather than that in § 38 regarding consistency of
rates as applied to classes of customers. By explicitly referring
to Docket 8032, the Commission made clear that the "consistency in
LCRA's rate design" is consistency in maintaining the voltage level
collapse ordered in Docket Number 8032, only forty-two days before
LCRA filed the docket at issue in the present case.

 In addition, conclusion of law no. 10 in the final order
explicitly refers to § 38 and is drafted to embody the fact finding
required by that section. See Charter Medical, 665 S.W.2d at 451. 
If fact finding no. 59 also referred to the consistency standard of
§ 38, it would repeat conclusion of law no. 10. It is a basic rule
of statutory construction that each sentence, clause, and word of
a statute is to be given effect if reasonably possible. Perkins v.
State, 367 S.W.2d 140, 146 (Tex. 1963). Similarly, we presume that
the Commission did not intend to make redundant ultimate findings
or conclusions of law, and that, therefore, the "consistency"
referred to in fact finding no. 59 is not the same "consistency"
referred to in conclusion of law no. 10.

 Because "consistency" as used in fact finding no. 59 is
not a factor that PURA expressly requires the Commission to
consider in the rate-making process, APTRA § 16(b) does not require
findings of basic or underlying fact. See Texland, 701 S.W.2d at
269. Judicial review of findings not required by statute is
limited to whether the basic findings fairly and reasonably
supported the ultimate findings. Galveston County, 724 S.W.2d at
126; Texland, 701 S.W.2d at 273. "The reviewing court, in
determining whether the administrative agency has adequately
articulated its findings of fact and conclusions of law, is to give
appropriate consideration to such statements in the reports that
were adopted by the Commission in its final order." AT&T, 777
S.W.2d at 366. See also Goeke v. Houston Lighting & Power Co., 797
S.W.2d 12, 15 (Tex. 1990).

 The examiner's report, as adopted by the Commission,
shows why the Commission found that keeping the voltage collapse
would be "consistent." (3)
 The report summarizes prior Commission
orders in LCRA rate cases in 1985 and 1987, and in the 1988 order
in which the Commission ordered the voltage differential collapse. 
Application of Lower Colorado River Authority for Authority to
Change Rates, Docket No. 8032, 14 P.U.C. Bull. 1487 (Sept. 22,
1988). In Docket No. 8032, "[t]he Commission found the voltage
differential between 138 kV and 69 kV systems to be technically not
supportable and further found that the differential should be
collapsed for rate purposes." 

 The examiner's report also recognizes that Docket No.
8400 is one in a series of rate filings. LCRA filed this
application for an increase in rates as part of a plan for phasing
the third unit of the Fayette Power Plant into the rate base. The
biggest concern about bringing that unit into the rate base was

"rate shock." LCRA devised a three-step approach for phasing in
the debt service and for easing its impact on rates. Docket No.
7512 in 1987 was step one. Docket No. 8032 was step two. This
docket filing represents step three. LCRA projected that at least
one more rate increase would be necessary to address remaining debt
costs, but no additional rate increases were projected until the
late 1990s. The examiner's report, as adopted in the Commission's
final order, reveals why the Commission based its decision in
finding of fact no. 59 on maintaining consistency in LCRA's overall
rate design.



The Commission's Order Was Not Based on a Vote Trade 

 Appellants argue that the trial court erred in failing to
find that the PUC acted arbitrarily, capriciously, and upon
unlawful procedure, in rejecting the voltage differential. The
core of their contention is that the decision was reached by means
of an illegal vote trade, and that finding of fact no. 59 is merely
an attempt to justify the Commission's arbitrary decision.

 Appellants quote two separate interchanges, seven pages
apart in the transcript, in support of their contention:



Commissioner Campbell: "Commissioner Cassin, I guess
it's you and I are going to have to compromise somewhere
down the road to get two votes on something out here if
Chairman Greytok isn't going to deviate from her stand
whatsoever."


Chairman Greytok: "It's unusual that I don't, but I feel
firmly about it."


Commissioner Cassin: "If she's not going to change her
mind, then you and I are going to have to work out a
compromise."


Commissioner Campbell: "That's what it sounds like. 
Where are we -- we differ on the voltage collapse and the
seasonal rates."


. . . .


Commissioner Campbell; "Well, Commissioner Cassin, I'll
go with you on seasonal rates if you will leave the
voltage differential the way it is now."


Commissioner Cassin: "All right."



 Appellants argue that these discussions reveal that the
Commission's decision was made arbitrarily, in violation of APTRA
§ 19(e)(6). They argue that the colloquy shows that either the
agency improperly based its decision on nonstatutory criteria,
South Plains, 635 S.W.2d at 957, or the agency abused its
discretion by basing its decision on legally irrelevant factors or
by failing to consider legally relevant factors. Consumers Water,
774 S.W.2d at 721; Starr County, 584 S.W.2d at 355-56. Appellants
argue, in the alternative, that the colloquy reveals that the
decision was made upon unlawful procedure, as prohibited by APTRA
§ 19(e)(3).

 We reject appellants' argument for several reasons. 
Final orders of an agency are presumed to be valid. Imperial Am.,
557 S.W.2d at 284. We must judge the agency order on the basis
upon which it purports to rest. Professional Mobile Home Transport
v. Texas R.R. Comm'n, 733 S.W.2d 892, 904 (Tex. App. 1987, writ
ref'd n.r.e.). In the present cause, however, the appellants do
not attack the basis upon which the Commission's decision purports
to rest -- "consistency" in rate design between dockets -- as
either a non-statutory criterion or a legally irrelevant factor. 
See note 3, supra. Accordingly, we express no opinion as to
whether using "consistency" as the basis of the Commission's
decision violates APTRA § 19(e)(6) under the holdings in South
Plains, Consumers Water, or Starr County.

 We also reject appellants' argument because the record,
evaluated as a whole, reflects a process of discussion, careful
consideration, and compromise, rather than a "vote trade." 
Appellants argue that a jury decision based on such a "vote trade"
would constitute misconduct. Assuming the analogy applies,
however, such negotiations by a jury are permissible if they entail
allowable "compromise" rather than vote trading.

 Texas courts have recognize that jury verdicts may be 
products of compromise:



It is contemplated that jurors will engage in discussion
and argument; and that if unanimity in answering the
questions is ever to be reached concessions must be made
and initial opinions and conclusions must in some
instances be modified or even abandoned in the light of
convincing discussion and argument. Such concessions and
modifications of opinions will not ordinarily constitute
jury misconduct.



Rogers v. Stimson Contracting Co., 373 S.W.2d 548, 551 (Tex. Civ.
App. 1963, no writ). See Queen City Land Co. v. State, 601 S.W.2d
527, 529 (Tex. App. 1980, writ ref'd n.r.e.) ("proof that the
verdict was obtained by compromise does not constitute proof of
misconduct."); Texglass, Inc. v. Suhovy, 380 S.W.2d 904, 905-6
(Tex. Civ. App. 1964, writ ref'd n.r.e.) (taking a straw vote, in
the absence of an agreement to be bound by its results did not
constitute reversible error); Dickey v. Travelers Ins. Co., 356
S.W.2d 156, 159 (Tex. Civ. App. 1962, writ ref'd n.r.e.) (testimony
that it was necessary for jurors to "trade out" issues in order to
reach a verdict did not show misconduct). Texas courts have been
reluctant to probe the mental processes of the jury: "In the
absence of overt acts of misconduct, it is not permissible to probe
the minds of the jurors or to supervise their process of
reasoning." Dickey, 356 S.W.2d at 159. Furthermore, Tex. R. Civ.
P. Ann. 327(b) (Supp. 1991) bars most testimony concerning the
jury's process for reaching its decision.

 Courts have been similarly reluctant to probe the mental
processes of individual commissioners in administrative agencies. 
It is immaterial what a commissioner may have said or thought in
the process of arriving at a decision. City of Frisco v. Texas
Water Rights Comm'n, 579 S.W.2d 66, 72 (Tex. Civ. App. 1979, writ
ref'd n.r.e.); see also United States v. Morgan, 313 U.S. 409
(1940) (applying federal administrative law). "The thought
processes or motivations of an administrator are irrelevant in the
judicial determination whether the agency order is reasonably
sustained by appropriate findings and conclusions that have support
in the evidence." City of Frisco, 579 S.W.2d at 72. 

 This is not to suggest that an examining court may never
investigate a commissioner's thought processes. The Texas Supreme
Court has held that an exception exists to the general rule that
courts may not investigate the methods or motives behind an
agency's action if there is "corruption in its inception." Texas
State Bd. of Examiners in Optometry v. Carp, 388 S.W.2d 409, 414
(Tex. 1965). The record here reveals no corruption in the
inception. 

 On its face, the record in this cause shows three
commissioners of divergent viewpoints struggling to promulgate a
final order. In order to reach a decision, at least two of them
must agree, a process that may require compromise. The
conversations quoted as representing a "vote trade" reflect a small
part of the 138 pages of transcript recording the Commission's
deliberations in Docket No. 8400. The final order hearing started
at 9:00 a.m. and, with breaks, continued until 4:30 p.m. The
following summary of the commissioners' discussions puts the quoted
passages into context. 

 During closing arguments, Campbell and Cassin questioned
the purpose of the voltage differential and the wisdom of
continuing the collapse ordered in Docket No. 8032. Following
closing arguments, Greytok stated that she favored adopting the
parties' stipulation. Campbell responded that she supported the
examiner's report with some exceptions and expressed concern about
doing "another flip-flop on the voltage collapse." Cassin did not
embrace either position but suggested keeping a list of items upon
which they disagreed.

 Cassin then stated his position -- he wanted to
reestablish the voltage differential and to establish seasonal
rates. Greytok pointed out that adopting the stipulation would
achieve these ends, but Cassin refused to support the stipulation. 
He agreed with the examiner that the facilities-credit proposal in
the stipulation had not been evaluated sufficiently.

 Campbell suggested that she could compromise on seasonal
rates, but that the voltage differential collapse should be
continued. She then appeared to back away from her suggestion by
stating that she agreed with the examiner on seasonal rates. 
Cassin repeated his preference for establishing seasonal rates and
reestablishing the voltage differential. Cassin and Campbell
discussed the differential, but reached no conclusion.

 Cassin asked Greytok for her position on the differential
and seasonal rates; she stated that she preferred the stipulation,
but wanted to consider it further. After a break, Greytok
reaffirmed her support for the stipulation; Cassin again rejected
the stipulation because of the facilities credit provision. 

 Campbell repeated that she would not approve the
stipulation; her only objection to the examiner's recommendation
was the "flip-flop" on the voltage differential. She argued that
if the voltage differential were reinstated, some customers would
suffer a big rate increase. Cassin inquired, "Are we going to vote
1-1-1?" Greytok re-urged adoption of the stipulation; again,
Campbell rejected it.

 At this point, the first exchange quoted above took
place. Campbell stated that if at least two Commissioners could
not agree on a final order, then LCRA's rate proposal, which none
of the commissioners supported, would go into effect. She stated
that if Greytok refused to change her position on the stipulation,
then Campbell and Cassin would have to compromise. They then asked
the examiner to summarize the issues that had not been decided. 
The examiner identified the outstanding issues as seasonal rates
versus ratchet, the voltage differential, direct and allocated
water, and retail sales proceeds.

 Greytok asked Cassin to reconsider the stipulation
because it contained his position on both seasonal rates and the
voltage differential. Cassin declined. Campbell offered Cassin
the resolution quoted by appellants in the second exchange above: 
retaining the collapse, but ordering seasonal rates, to which he
agreed.

 Out of context, the Commissioners' comments might
arguably be viewed as a "vote trade." In the context of the whole
transcript, however, these comments are part of the allowable and
inevitable process of forging compromise out of divergent
preferences, based upon the evidence produced.

 Appellants also argue that the Commission's decision is
based upon unlawful procedure in violation of APTRA § 19(e)(3). In
the only reported case we have found touching upon an agency's
unlawful procedure, Texas State Board of Medical Examiners v.
Nacol, 696 S.W.2d 687 (Tex. App. 1985, writ ref'd n.r.e.), the
court of appeals affirmed the trial court's finding that the
Board's decision had been based upon unlawful procedure. The
opinion reflects the following:



A member of the board disqualified himself but attended
the hearings and repeatedly conferred with its Chairman. 
The Board acted like prosecutors rather than fact finders
and, in voting, used the word "guilty" to the
allegations, rather than "true". Certain vials were
considered by the Board, but were never introduced in
evidence. Dr. Varon was to be a favorable witness, as
well as other physicians, to Dr. Nacol but were "scared
off" by an investigator of the Board. Dr. Varon did
testify under a subpoena, after being assured of
protection and immunity by a court. The testimony began
in Wichita Falls, the hearing was then moved to Austin,
then to Dallas. Board members conferred with witnesses
in the halls outside the hearing room.



Nacol, 696 S.W.2d at 688.

 The Commissioners' discussions in reaching their decision
in Docket 8400 stand in stark contrast to the kind of behavior that
constituted "illegal procedure" in the Nacol case. We reject
appellants' contention that the Commissioners' compromise violated
APTRA § 19(e)(3).



The Commission Was Not Required to Accept Duplicative Rebuttal
Testimony.

 Finally, one appellant, Guadalupe Valley Electric
Cooperative, Inc. ("Guadalupe Valley"), alleges that the Commission
erred in excluding from the record an exhibit that it presented as
rebuttal testimony on the issue of the voltage level collapse. The
point of error is overruled. 

 As the hearing examiner explained in her report, the
Commission's usual practice is to allow only the company seeking
the rate change to file any rebuttal testimony. In Docket No.
8400, however, a special procedure was granted whereby intervenors
and staff would be allowed to file rebuttal testimony to issues
intervenors raised if LCRA filed no response. 

 The special procedure was unnecessary because the
differential collapse was contained in LCRA's original filing in
the case; it was not an issue raised by intervenors to which LCRA
failed to respond. As required by PURA, when LCRA initiated Docket
No. 8400, it also filed its evidence, including the prepared
testimony of all witnesses and the exhibits in support of its
petition to change rates. The scope of the prefiled case specified
by PUC rules is such that the utility is required to go forward at
the hearing on the data submitted with the filing: "the material
submitted as the filing and supporting workpapers are required to
be such composition, scope, and format so as to serve as the
utility's complete case." 16 Tex. Admin. Code § 21.69(a) (1988). 
The Commission allows the applicant to file rebuttal testimony
after intervenors and staff file their direct case, but intervenors
are generally not entitled to present a rebuttal case. The party
with the burden of proof is entitled to open and close. 16 Tex.
Admin. Code § 21.103 (1988). This practice is consistent with the
statutory requirement that the burden of proof to show that the
proposed rate change is just and reasonable is on the public
utility. See APTRA § 40.

 The examiner ruled to strike Guadalupe Valley's rebuttal
testimony because:



1. the Examiner's orders had contemplated intervenor
rebuttal only if LCRA did not respond to an issue
raised by an intervenor and only if there was no
adversarial testimony in the record;


2. a considerable amount of testimony was already in
evidence; and


3. the additional evidence would be cumulative, would
unduly delay the hearing, and would preclude
opposing intervenors from replying to the rebuttal
testimony.



 In contested cases, irrelevant, immaterial, or unduly
repetitious evidence shall be excluded. See APTRA § 14(a). 
Appellants submitted fifty-two exhibits that were admitted into
evidence and presented a total of eleven witnesses. They were able
to cross-examine all witnesses. The evidentiary hearing in this
cause lasted twenty-four days and produced a 4,964 page transcript. 
The trial court did not err in refusing to find that the Commission
acted arbitrarily or capriciously in affirming the striking of
Guadalupe Valley's rebuttal testimony.

 All of appellants' points of error are overruled, and the
judgment of the trial court is affirmed. 



 

 Marilyn Aboussie, Justice

[Before Justices Powers, Aboussie and Kidd]

Affirmed

Filed: May 8, 1991

[Publish]

1. Appellants are the Pedernales Electric Cooperative, Inc.,
Guadalupe Valley Electric Cooperative, Inc., New Braunfels
Electric Cooperative, Inc., New Braunfels Utilities, De Witt
County Electric Cooperative, Inc., San Bernard Electric
Cooperative, Inc., and the City of San Marcos.
2. Appellants do not challenge conclusion of law no. 10.
3.   In its brief, appellant Pedernales argues that if in
finding of fact no. 59 the Commission was using "consistency" as
meaning historical practice, then the Commission was creating a
new standard not included in the enabling legislation. When an
agency bases its decision on a factor not included in the
enabling legislation, that decision is arbitrary and capricious
under South Plains, 635 S.W.2d at 957 and Starr County, 584
S.W.2d at 355-56. None of the appellants, however, made this
argument in their motions for rehearing before the Commission. 
Accordingly, they have waived their right to complain on appeal. 
Sears v. State Bd. of Dental Examiners, 759 S.W.2d 748, 750 (Tex.
App. 1988, no writ). Indeed, in its motion for rehearing before
the Commission, appellant Pedernales conceded that the Commission
may base its decision on "consistency" as that term is used in
finding of fact no. 59: "consistency in rate design is a factor
to be considered but the Commission must still base its decision
on the evidence before it."