TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00232-CV






Robert "Lee" Hammack, et al., Appellants


v.


Public Utility Commission of Texas, et al., Appellees (1)







FROM THE DISTRICT COURT OF TRAVIS COUNTY,126TH JUDICIAL DISTRICT

NO. GN101963, HONORABLE DARLENE BYRNE, JUDGE PRESIDING





O P I N I O N




 Robert "Lee" Hammack and others ("appellants") appeal from a district court
judgment affirming an order of the Public Utility Commission of Texas (the "Commission") granting
a certificate of convenience and necessity ("CCN") to Central Power and Light Company ("Central
Power"). (2) Before an electric utility may construct a transmission line, it must obtain a CCN from
the Commission. See Tex. Util. Code Ann. § 37.056 (West 1998) (hereinafter "PURA"). The
Commission referred Central Power's application to the State Office of Administrative Hearings
("SOAH"). After conducting a contested-case hearing according to the Administrative Procedure
Act ("APA"), the Administrative Law Judge ("ALJ") issued a proposal for decision ("PFD")
recommending denial of Central Power's application. See Tex. Gov't Code Ann. §§ 2001.001-.902
(West 2000 & Supp. 2003). The Commission declined to adopt the proposal for decision in its
entirety and approved Central Power's application for a CCN. The district court affirmed the
Commission's order. (3)

 Appellants appeal by fourteen points of error, complaining that: (1) the Commission
applied a new standard in finding a need for the line, inconsistent with the statutory requirements;
(2) the finding of need for the line was not supported by substantial evidence; (3) the finding that the
new service will lower costs to customers and improve service is not supported by substantial
evidence; and (4) the Commission improperly approved the route for the line. In addition, appellants
complain of various procedural irregularities in adopting the order. We will affirm the judgment of
the district court, affirming the order of the Commission.


FACTUAL BACKGROUND


 Many electric utilities in Texas have voluntarily interconnected their transmission
systems, enhancing reliability and providing opportunities for utilities to purchase power from one
another. This interconnected network of transmission lines forms a single grid within the state,
known as the Electric Reliability Council of Texas (ERCOT). Although two other regional power
grids serve parts of the state, ERCOT serves most of the state. (4) 

 ERCOT is required to establish an Independent System Operator (ISO) charged with
oversight of the transmission system in Texas. See PURA § 39.151 (West Supp. 2003). One of the
statutory directives is to "ensure the reliability and adequacy of the regional electrical network." Id.
§ 39.151(a)(2). To accomplish this, ERCOT is given authority to enforce operating standards by
establishment of policies, rules, guidelines, and procedures. Id. § 39.151(d), (h). To effectuate the
legislative goal of adequate and reliable service, utilities are required to abide by the policies, rules,
and procedures established by ERCOT. Id. § 39.151(j). The ISO's responsibilities include providing
an annual report to the Commission identifying existing and potential transmission and distribution
constraints, system needs, and recommendations for meeting those needs. See id. § 39.155(b) (West
Supp. 2003). (5)

 In 1996, Central Power expressed a concern regarding a shortage of power in the Rio
Grande Valley. The line which is the subject of this case was proposed to ERCOT to increase the
capacity of transmission into the Rio Grande Valley to meet a future-projected load. On October 1,
1999, pursuant to the requirements of PURA section 39.155, the ISO sent a report to the
Commission identifying, among other concerns, a constraint on the transfer capacity of power into
South Texas as well as a constraint on transfer capacity from South to North. 

 On November 30, 1999, Central Power filed its application for a CCN to construct
a 53-mile-long, high-voltage transmission line from Central Power's Coleto Creek Power Plant in
Goliad County to the Pawnee Substation in Karnes County. The Commission referred the case to
SOAH to conduct a contested-case hearing. Numerous landowners, some of whom were plaintiffs
below, intervened in the agency proceeding. In August 2000, the ALJ issued a PFD recommending
denial of the application. The ALJ found, among other things, that there was insufficient evidence
demonstrating a public need for the proposed line. However, the PFD supported the route proposed
by Central Power.

 The Commission reviewed the evidence and in its final order found there was a public
need for the line, that existing service was inadequate, and that granting the CCN would result in a
probable improvement of service or lower costs to consumers. Appellants sought judicial review
in district court, which affirmed the Commission's order in March 2002. Appellants appeal from
the judgment.


DISCUSSION


Statutory Requirements of Necessity

 Before addressing appellants' points of error, it is necessary first to set out the
statutory provisions that govern the Commission's issuance of certificates of convenience and
necessity. Under section 37.051 of PURA, a public utility is forbidden to render service to the
public, directly or indirectly, "unless the utility first obtains from the commission a certificate that
states that the public convenience and necessity requires or will require the installation, operation,
or extension of the service." Id. § 37.051 (West Supp. 2003). The Commission can grant a CCN
pursuant to PURA section 37.056 as follows:


Section 37.056. Grant or Denial of Certificate


(a) The commission may approve an application and grant a certificate only if the
commission finds that the certificate is necessary for the service,
accommodation, convenience, or safety of the public.


(b) The commission may:


 (1) grant the certificate as requested;


 (2) grant the certificate for the construction of a portion of the requested
system, facility, or extension or the partial exercise of the requested right
or privilege; or


 (3) refuse to grant the certificate.


(c) The commission shall grant each certificate on a nondiscriminatory basis after
considering:


 (1) the adequacy of existing service;


 (2) the need for additional service;


 (3) the effect of granting the certificate on the recipient of the certificate and 
any electric utility serving the proximate area; and 


 (4) other factors, such as:


 (A) community values;


 (B) recreational and park areas;


 (C) historical and aesthetic values;


 (D) environmental integrity; and 


 (E) the probable improvement of service or lowering costs to consumers 
in the area if the certificate is granted.



Id. § 37.056 (West 1998). The Commission's Substantive Rule section 25.101(c) provides:


(c) Certificates of convenience and necessity for new service areas and facilities. 
Except for certificates granted under subsection (b) of this section, the
commission may grant an application and issue a certificate only if it finds that
the certificate is necessary for the service, accommodation, convenience, or
safety of the public. For transmission line certificate applications the
commission shall give great weight to the recommendation of the Electric
Reliability Council of Texas (ERCOT) Independent System Operator (ISO) in
determining the need for a proposed transmission line.



16 Tex. Admin. Code § 25.101(c) (2003).


"Necessity"

 In points of error one and four, appellants contend the Commission applied a new
legal standard of public need inconsistent with the plain meaning of PURA section 37.056(a) and
in excess of the Commission's statutory authority, resulting in due-process violations. Appellants
point to the language in the Commission's order where, in disagreeing with the PFD, the agency
states that "a broader view should be taken when evaluating the issue of need." In doing so,
appellants argue, the Commission applied a new legal standard to the determination of public
necessity, under PURA section 37.056, that is inconsistent with the statutory language. Specifically,
appellants argue that the Commission justified approving the application based on a global assertion
of the "needs of the interconnected statewide transmission systems," which is broader than those
stated in the statute. Appellants claim that the Commission can only consider the "adequacy of
existing service" and "the effect of granting the certificate on the recipient of the certificate and any
electric utility serving in the proximate area." PURA § 37.056(c)(3).

 The standard applicable to the CCN proceeding, set forth in PURA section 37.056,
states that in approving a CCN the Commission must find that it is necessary for the "service,
accommodation, convenience, or safety of the public." Id. § 37.056(a). Further, section 37.056(c)
sets out factors for the Commission to consider in granting a certificate, such as the adequacy of
existing service, the need for additional service, the effect on both the recipient of the certificate and
any other utilities serving the area, and other factors, such as community values, recreational and
park areas, historical and aesthetic values, environmental integrity, and the probable improvement
of service or lowering of cost to consumers in the area. Id. § 37.056(c)(1)-(4).

 In this case, the Commission concluded that the "proposed line is necessary for the
service, accommodation, convenience, or safety of the public." In support of its conclusion, the
Commission made numerous findings of fact. Some of the more critical of these findings are:


l9. An October 1, 1999 "Report on Existing and Potential Electric System
Constraints and Needs in ERCOT," filed with the Commission by the ERCOT
ISO, identified existing and potential transmission constraints and system needs
throughout the ERCOT system and included [Central Power's] proposed
project in its list of recommended projects to address these constraints.


20. One such constraint identified by the ISO was a constraint on the transfer
capacity of power to the Corpus Christi area and points south.


21. This constraint was first identified by the ISO in October 1998, and on
December 15, 1998, the ERCOT Board of Director[s] adopted the ISO's
recommendation that the proposed transmission line be constructed.


22. The ISO recognized, in its 1999 report, that the import constraint had been
substantially addressed since four new cogeneration units came on line in South
Texas during the summer of 1999. The report states:


Constraint to the Rio Grande Valley


All transmission lines in the area have remained in service during the
summer [of 1999] (except for a short time during hurricane Bret). Since
two Frontera generating units (total 300 MW) came on line in the Valley
during the summer, the number of schedule curtailments and generation
realignments have been all but eliminated compared with the summer of
1998. With availability of redispatch from new generation for unplanned
transactions, the Valley system operation has been able to meet ERCOT
transmission security (first contingency) criteria.


23. Power generation has for the past decade been insufficient in South Texas,
particularly in Corpus Christi, Laredo, and the lower Rio Grande Valley,
requiring [Central Power] to import power in amounts up to 900 megawatts
(MW) during peak load conditions and, at times, to interrupt service to its
customers in that region.


24. As of the time of the hearing in this proceeding, five new power generation
plants were under construction in South Texas.


25. New construction of power generation plants in South Texas is expected to
increase available power in that region by approximately 2,700 MW in the near
future and approximately 4,000 MW in the long run.


26. [Central Power] provided substantial evidence that there is currently a
constraint on the export of power from South Texas to other parts of Texas, that
the existing transmission system is inadequate to support the export of the
excess power, and that the proposed project will relieve the constraint.


26A. Increasing transmission capacity to and from the Corpus Christi area and South
Texas will permit additional power imports to and exports from these areas. 
Without increasing this capacity through such steps as the construction of the
Coleto Creek-Pawnee transmission line, new, highly efficient generators will
be constrained from making sales into the ERCOT market. Increasing
transmission capacity will allow for the economic and competitive exchange
of electric power among all systems and industry participants and such transfers
help to reduce the cost of electric supply to customers and provide a more
liquid market.


27. [Central Power] provided affirmative evidence to establish that the existing
service is inadequate and that there is a need for additional transmission
service. 



 The Commission based its findings on both the ISO October 1999 report and the
testimony of Paul Hassink, Manager for ERCOT/Mexico Region Transmission Planning for Central
and South West Services. The ISO's report identified transmission constraints from South Texas
to North Texas, into the Rio Grande Valley, and in the Corpus Christi area. The report states that:


Due to its very nature, transmission planning is a continuous process. Therefore,
conclusions reached in this report are a snapshot in time that can change with the
addition (or elimination) of plans for new generation, transmission facilities,
equipment, or loads.


. . . . 


The new transmission projects discussed in the report are intended to ensure
conformance to ERCOT Planning Criteria and North American Electric Reliability
Council (NERC) system reliability standards.


. . . .

 

The first purpose of this report is to document the process of changes and additions
to the ERCOT transmission grid. This helps to ensure continuity in the development
of the transmissions grid, consistency in the evaluation of grid adequacy, and
documents the need for new facilities.



Commission substantive rule section 25.101 says that the Commission shall "give great weight to
the recommendation" of the ISO in determining the need for a proposed transmission line, reflecting
the agency's recognition of the expertise possessed by the ISO in the area of electrical transmission
and distribution. See 16 Tex. Admin. Code § 25.101(c). 

 Moreover, Hassink explained that since ERCOT's initial report in 1998, the
construction of a substantial amount of new generation began in the Corpus Christi and Lower Rio
Grande Valley areas. However, this new generation would result in potential export constraints and
would not eliminate import constraints during peak usage. Hassink testified that of the 2,700 MW
of new generation under construction, 1,000 MW could be used to serve Central Power's customers
in the Rio Grande Valley and only 1,000 MW could be exported out of the Rio Grande Valley. 
Therefore, without Central Power's proposed project, 700 MW of generation from new, highly
efficient generators will be constrained to the Rio Grande Valley and any additional generation in
the area will serve to exacerbate the export transmission constraint. In addition, Hassink testified
that Central Power is still in a situation where it must import electricity to serve its customers during
the summer when its load is at its peak.

 Appellants take from its context the Commission's statement that "a broader view
should be taken when evaluating the issue of need." In its final order, the Commission explained
that the ALJ's focus had been too narrow in finding that Central Power failed to meet its burden to
prove public need, concluding that a broader view should be taken in that regard. The Commission
explained that the constraints identified in the ERCOT report, which was only part of the evidence
offered by Central Power to meet its burden of proof on public need but on which the ALJ based her
ruling, were much broader than simply the need for imported power to South Texas. (6) In disagreeing
with the ALJ, the Commission stated:


When considering whether a project is necessary for the service, accommodation,
convenience, or safety for the public, the focus should not be limited to the needs of
an isolated geographic area, but instead should consider the needs of the
interconnected statewide transmission systems. The Commission gives more weight
to the broader, overall policy goals of encouraging the development of interconnected
transmission systems to allow new generation to be fully integrated into the grid, to
provide for additional competition in the wholesale market, and to promote lower
energy prices. 



 The legislature has expressly charged the Commission to determine whether a
certificate for a transmission line should be issued. PURA §§ 37.051, .053, .056 (West 1998 &
Supp. 2003). The legislature has also set forth the standards the Commission must consider in
making that determination. Id. § 37.056. These factors are stated in the broadest possible terms and
are intended as legislative standards to guide the Commission in its administration of the certification
process. Public Util. Comm'n v. Texland Elec. Co., 701 S.W.2d 261, 266 (Tex. App.--Austin 1985,
writ ref'd n.r.e.). As this Court stated in Texland, 


To implement in particular circumstances such broadly stated legislative objectives
and standards, the Commission must necessarily decide what they mean in those
circumstances and because some of them obviously compete inter se, the agency may
in some cases be required to adjust or accommodate the competing policies and
interests involved. For example, a "need" for additional service implies a relative
requirement, ranging from an imperative need to one that is minimal; and, if a "need"
be sufficiently grave, it may have to prevail notwithstanding an adverse affect upon
another interest, such as the environment. Conversely, "environmental integrity"
may in some circumstances have to prevail over a need for the additional service. 
None of the statutory factors is intended to be absolute in the sense that any one shall
prevail in all possible circumstances. In making these sometimes-delicate
accommodations, the agency is required to exercise its "expertise" to further the
overall public interest.



Id. The Commission may find it necessary to specify and employ more particular factors in order
to effectuate the general factors expressed in section 37.056. Id. at 267. This is a matter that is
within the Commission's discretion. Id.

 In addition, the Commission's interpretation of need must be viewed in light of the
legislative directive that the Commission formulate policies responsive to the needs of the emerging
competitive wholesale market. In PURA section 31.001, the legislature concluded:


The wholesale electric industry, through federal legislative, judicial, and
administrative actions, is becoming a more competitive industry that does not lend
itself to traditional electric utility regulatory rules, policies, and principles. As a
result, the public interest requires that rules, policies, and principles be formulated
and applied to protect the public interest in a more competitive marketplace. The
development of a competitive wholesale electric market that allows for increased
participation by electric utilities and nonutilities is in the public interest.



PURA § 31.001 (West 1998). The Commission's evaluation of public need from the standpoint of
a statewide wholesale delivery of electricity is responsive to this legislative policy; and, it is well 
within the Commission's authority to decide what the statutory standard of "need" means in any
specific situation.

 As a general rule, administrative agencies possess by implication such powers as may
be necessary to effectuate the legislative objectives which underlie the administrative powers
expressly conferred upon them. Texland Elec., 701 S.W.2d at 269. Because administrative agencies
are given their statutory powers with a view to achieving legislative purposes more fully and
effectively through the agency's specialized judgment, knowledge, and experience, the methods
chosen by the agency, and its interpretation of the statute it is required to administer, are entitled to
judicial respect. Id. Moreover, the Commission has been given more control than some other
agencies over the ultimate disposition of its cases. See PURA § 14.051 (West 1998); (7) Southwestern
Pub. Serv. Co. v. Public Util. Comm'n, 962 S.W.2d 207, 214 (Tex. App.--Austin 1998, pet. denied). 
This especially makes sense in the public-utility arena. Public-utility matters are frequently complex,
often involving objective evidence more conducive to review on a written record than evidence such
as live-witness testimony and its attendant credibility concerns. Southwestern Pub. Serv., 962.
S.W.2d at 214. 

 In this case, the Commission reasonably interpreted and applied the public-need
standard by including a consideration of customers and market participants throughout the state as
opposed to only one isolated part of the state. Moreover, in considering public need in light of an
expected impact of the line in the area in which it is to be constructed, the Commission found, based
on Hassink's testimony, that inadequacies in service in the area near the line in South Texas created
a need for the line, concluding:

[M]r. Hassink's testimony supports a finding that the transmission constraint
originally identified by the ISO still exists, and that the constraint now presents a
problem both for importing electricity into and exporting electricity out of the South
Texas area.



The determination of public need is made at the time of the hearing. The ERCOT report is but one
part of the evidence the commission relied on in making this determination. Additionally, the
Commission is not constrained by the public need identified in the application for a CCN. The facets
of public need may very well be fluid. Addressing one need may create another, as is evidenced in
this case. For example, at the time the ERCOT report was generated in 1999, several new
cogeneration units were under construction to meet the constraint on the import of power to South
Texas. However, with the new cogeneration units came a corresponding constraint relating to the
export of power from South Texas. In addition, there was still an identifiable constraint on the
import of power during the summer months when usage is at its peak. These constraints are
specifically addressed in the Commissions findings 26 and 26A, set forth above.

 We cannot conclude that the Commission has applied an inappropriate or new legal
standard in its determination of a public need for the proposed line. It is the Commission's role to
apply the statutory standards in a given case. This Court has addressed the Commission's flexibility
in applying the statutory criteria established in PURA section 37.056. See Texland Elec., 701
S.W.2d at 266. We hold the Commission did not improperly apply section 37.056 in light of the
entire statutory scheme and overrule points of error one and four. (8)

The Substantial Evidence Rule

 In points of error two and three, appellants complain that there is not substantial
evidence to support the granting of the CCN. We review Commission orders under the substantial
evidence rule. See PURA § 15.001 (West 1998); Tex. Gov't Code Ann. § 2001.174 (West 2000). 
Under the substantial evidence rule, we presume that the Commission's order is supported by
substantial evidence and appellants have the burden to overcome this presumption. See Sportscoach
Corp. of Am. v. Eastex Camper Sales, Inc., 31 S.W.3d 730, 733 (Tex. App.--Austin 2000, no pet.);
Meier Infiniti Co. v. Motor Vehicle Bd., 918 S.W.2d 95, 98 (Tex. App.--Austin 1996, writ denied).

 The APA's "substantial evidence" test provides that a court reviewing an agency
action shall reverse and remand the cause to the agency when substantial rights of the appellant have
been prejudiced by an agency's findings that are not reasonably supported by substantial evidence
considering the reliable evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E). 
This means we may not substitute our judgment for that of the agency on the weight of the evidence;
we must, however, test any disputed finding of basic or underlying fact against that body of evidence. 
Lauderdale v. Texas Dept. of Agric., 923 S.W.2d 834, 836 (Tex. App.--Austin 1996, no writ). The
crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in
light of the evidence from which they were purportedly inferred." John E. Powers, Agency
Adjudications 163 (1990). "Substantial evidence" is thus a term of art. It "does not mean a large
or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion" of fact. Lauderdale, 923 S.W.2d at 836 (quoting Pierce
v. Underwood, 487 U.S. 552, 564-65 (1988)). Therefore, we will sustain an agency's finding if
reasonable minds could have reached the same conclusion. Texas State Bd. of Dental Exam'rs v.
Sizemore, 759 S.W.2d 114, 116 (Tex. 1988).

 Appellants first argue in point of error two that the Commission's finding of a public
need for the line is not supported by substantial evidence. As discussed above, in reaching its
determination that the proposed transmission line was needed, the Commission relied on the 1999
ISO report and the testimony of Hassink. Appellants challenge the Commission's reliance on this
evidence for various reasons; however, none of appellants' challenges discredit the ERCOT report
or Hassink's testimony as evidence from which the Commission could reasonably infer a public need
for the proposed line.

 Appellants assert that because of the construction of four new generation facilities
in South Texas, the need to import power to South Texas was eliminated. However, the evidence
before the Commission was that these new generation facilities created another constraint--a
constraint on the export of power from these new facilities in South Texas to other parts of Texas. 
Further, Hassink testified that the need for the proposed line to import electricity in the summer
months when load is at a peak continues to exist.

 Appellants' arguments do not overcome their substantial burden. The Commission's
decision need only be supported by substantial evidence, i.e., "whether some reasonable basis exists
in the record" for the agency determination. State v. Public Util. Comm'n, 883 S.W.2d 190, 204
(Tex. 1994). The ISO report and the testimony of Hassink clearly provide a reasonable basis in the
record for the Commission's determination of need. Point of error two is overruled. 

 In their third point of error, appellants contend that the requirement that a utility
demonstrate that a proposed transmission line lowers cost and improves service for customers was
not supported by substantial evidence. PURA section 37.056(c) requires the Commission to consider
whether the proposed line will result in "the probable improvement of service or lowering of cost
to consumers." PURA § 37.056(c)(4)(E). The Commission included in its order a finding that
specifically addresses this factor--finding of fact 26A, set forth above. Moreover, findings of fact
23-26, set forth above, are additional factual findings that support the Commission's ultimate finding
that Central Power's application adequately addresses the statutory factor of probable improvement
of service or lowering of costs to consumers. 

 Hassink's testimony supports the Commission's finding of a transmission constraint
preventing the export of power from South Texas to other markets. He testified that Central Power's
analysis shows that the Coleto Creek line is needed to support an increased level of power exports
from South Texas and Central Power's system is insufficient to handle the required power transfer. 
He then explained how a lack of sufficient transmission capacity prevents movement of power. In
addition, Hassink's testimony affirms a continuing need for the line to facilitate import of power to
South Texas and the Commission could reasonably conclude as it did.

 In its order, the Commission noted that increasing transmission capacity to and from
the Corpus Christi area and South Texas will permit additional power imports to and exports from
these areas. Without increasing this capacity through such steps as the construction of the Coleto
Creek-Pawnee transmission line, new, highly efficient generators will be constrained from making
sales into the ERCOT market. Therefore, the Commission concluded that there was a sufficient
showing of probable improvement of service or lowering of costs to consumers. We hold there is
a reasonable basis in the record to support the Commission's finding that the proposed line will
result in the probable improvement of service or lowering of cost to consumers. Point of error three
is overruled.


Route Challenges

 In points of error five through seven, appellants complain that the Commission's
order regarding the route of the line did not properly consider the statutory criteria and is not
supported by substantial evidence. We disagree. In determining the route, the Commission had
before it a variety of evidence, including a routing study provided by a consulting firm hired by
Central Power, and the testimony of several witnesses.

 To determine the best route for the line, Central Power employed Burns and
McDonnell to provide an independent routing study and assess the environmental impacts of the
proposed line. Burns and McDonnell studied 28 different routes, eventually recommending the route
proposed in Central Power's application as the preferred route. They also evaluated many of the
statutory factors in PURA section 37.056, such as community values, historical and aesthetic values,
parks and recreation areas, and environmental impacts.

 With respect to community values, the study showed (1) no significant impact on land
use in the area of the preferred route, (2) no residences or habitable structures within 200 feet of the
centerline, (3) no commercial or municipal properties within 200 feet of the centerline, (4) no
schools, churches, nursing homes, hospitals, or known cemeteries within 200 feet of the centerline,
(5) no pastures or croplands irrigated by traveling irrigation systems that will be traversed by the line,
(6) no AM or FM radio transmitters within 10,000 feet of the centerline, but two microwave-relay
stations within 2000 feet and one microwave tower within 300 feet of the centerline, none of which
will be adversely affected by the line, (7) one unregistered private-use airstrip within 10,000 feet of
the centerline, and (8) no parks within 1,000 feet of the centerline and one recreation area, situated
at the Coleto Creek Power Plant and owned by Central Power, that is crossed by the line.

 Burns and McDonnell further concluded that there would probably be no impact on
historical or archeological resources in the area and minimal visual impacts on the area. Further,
they found that the environmental impacts would be minor or limited and temporary due primarily
to construction activities, based on an analysis of the terrain and soils, hydrology, vegetation, and
wildlife in the area. As a result of this study, the preferred route was requested by Central Power in
its application.

 Appellants first complain that the Commission erred by failing to require Central
Power to route the transmission line so that it followed existing rights of way. In considering an
application for a certificate of convenience and necessity, section 37.056(c) requires the Commission
to consider such factors as "community values, recreational and park areas, historical and aesthetic
values, environmental integrity, and the probable improvement of service or lowering of cost to
consumers . . . ." Id. § 37.056(c)(4)(A)-(E). It is the applicant's burden to produce evidence relative
to such factors, and the Commission's duty to file findings with respect to such factors. There is
nothing in section 37.056(c) that requires the Commission to consider utilization of existing rights
of way.

 In determining whether to grant a CCN for a transmission line, the Commission is
required only to consider, in the context of the case at hand, the statutory factors. See id. § 37.056. 
These factors give the Commission "stated objectives toward which to work" in authorizing CCNs. 
Texland Elec., 701 S.W.2d at 266. This Court has recognized that some of the factors may compete,
so that the Commission may, in some cases, be required to "adjust or accommodate the competing
policies and interests involved." Id. Thus, to implement these broad factors in any particular case,
the Commission "must necessarily decide what they mean in those circumstances." Id. We hold the
Commission was not statutorily required to consider use of existing rights of way in evaluating
Central Power's proposed route. (9) Point of error five is overruled.

 Next, appellants complain that the Commission's order is not supported by substantial
evidence because Central Power did not officially propose additional routes. Appellants concede
that a utility is not required to propose alternative routes but argues that no reasonable person could
conclude that Central Power's only proposed route meets the statutory standards without
consideration of an alternative route that follows the existing right of way. In support of their
contention, appellants cite two cases, Goeke v. Houston Lighting & Power Co., 797 S.W.2d 12 (Tex.
1990) and Sam Houston Electric Cooperative v. Public Utility Commission, 733 S.W.2d 905 (Tex.
App.--Austin 1987, writ denied). However, neither Goeke nor Sam Houston Electric implies that
the Commission must consider alternative routes for its order to be supported by substantial
evidence. In fact, both cases expressly recite the principle that "PURA section 54(c) (10) does not
specifically require the applicant to present evidence that it studied alternative solutions to its
problem or alternative routes for the location of transmission lines." Sam Houston Elec., 733 S.W.2d
at 910; accord Goeke, 797 S.W.2d at 15 n.3 ("This does not mean that HL&P was required to show
that it considered alternative routes."). Further, in Frost v. Public Utility Commission, we held that
there is nothing in the statute that requires the applicant to present evidence on alternative routes,
and therefore, the Commission has no duty to find facts in that regard. 672 S.W.2d 883, 885 (Tex.
App.--Austin 1984, writ ref'd n.r.e.). In any event, there is substantial evidence in this case that
Central Power, with its consultants, studied numerous alternative routes. Point of error six is
overruled.

 Finally, appellants complain that the Commission's decision to approve the proposed
route is not supported by substantial evidence because the route studied is not the route approved. 
The record shows that Burns and McDonnell studied the entire area of the proposed line for
environmental and socioeconomic impacts. The overall review of the environmental and
socioeconomic factors for the area of the route is sufficient to support the Commission's four minor
changes to the route. These changes were made to address specific concerns expressed by the
individual landowners whose property was affected. Further, the changes Central Power
recommended were intentionally limited to the specific landowners' property. Therefore, the impact
of the change would only be on the property that had already been studied. Given the scope of Burns
and McDonnell's analysis, the Commission reasonably could conclude that the minor route changes
were not significant enough to have been outside the scope of the environmental assessment. 
Additionally, there was testimony that these types of minor changes to accommodate landowners
occur frequently in CCN proceedings. Due to the fluid nature of these proceedings, it is necessary
to make accommodations as the proceedings progress. Accordingly, point of error seven is
overruled. 


Procedural Irregularities

 In points of error eight through thirteen, appellants complain of numerous procedural
irregularities. The majority of the procedural irregularities are allegations that the ex parte
communication prohibition of the APA was violated. See Tex. Gov't Code Ann. § 2001.061 (West
2000). Appellants also claim that the Open Meetings Act was violated because the Commission
made changes to the findings and conclusions in the ALJ's PFD, which were not discussed in any
of the open meetings held by the Commission. See id. §§ 551.001-.146 (West 1994 & Supp. 2003). 
Finally, appellants argue that the trial court erred by sustaining the Commission's claim of privilege
regarding certain documents. The trial court found that none of these claims required reversal of the
Commission's final order, and filed findings and conclusions that laid out the reasons appellants'
procedural irregularity claims failed. Appellants challenge several of these findings.

 Appellants complain of the following communications:


(1) Assignment of an individual who represented a party as advisory staff to the
decision-makers;


(2) Letters and e-mails received by the Commissioners from Sam Jones of ERCOT;


(3) Amicus Curiae filings received by the Commissioners from Reliant Energy, Inc.,
Calpine Corporation, and Public Utilities Board of Brownsville;


(4) Communications between Central Power and the Commission prior to the time
Central Power filed its application for a CCN; and


(5) The fact that Pat Wood, who was the Chairman of the Commission during this
docket, was also a member of the ERCOT board.



 Section 2001.061 of the government code provides:



Unless required for the disposition of an ex parte matter authorized by law, a member
or employee of a state agency assigned to render a decision or to make findings of
fact and conclusions of law in a contested case may not directly or indirectly
communicate in connection with an issue of fact or law with a state agency, person,
party, or a representative of those entities, except on notice and opportunity for each
party to participate.



Id. § 2001.061(a).

 Notwithstanding the trial court's filing of findings of fact and conclusions of law, the
fact remains that appellants bore the burden of proof to establish by evidence the procedural
irregularities they allege. And because they bore the burden of proof, they must show on appeal that
upon consideration of all the evidence, the trial court's failure to find such irregularities is against
the great weight and preponderance of the evidence. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.
1996). We may reverse the trial court's failure to find in appellants' favor only if, in our judgment,
the great weight and preponderance of the evidence supports an affirmative determination that such
irregularities did occur. See Ames v. Ames, 776 S.W.2d 154, 159 (Tex. 1989).

 Even if the findings of fact and conclusions of law filed by the trial judge are set
aside, that will not establish the findings appellants had to obtain to establish their claims of
procedural irregularities. In the interests of justice, however, we will as best we can consider
appellants' contentions as challenges to the trial court's failure to find facts that would establish the 
alleged procedural irregularities.

 Appellants first complain that the trial court erred in finding that Commission
attorney Tom Best did not "participate" in the contested case hearing as contemplated by the ex parte
prohibition. Best, an attorney with the Commission's Office of Regulatory Affairs during the time
this case was pending before SOAH, filled in for the attorney assigned to this case during the last
hour and forty-five minutes of the hearing. Appellants claim that his appearance rendered Best an
agency employee who participated in the contested case proceeding and thus the Commissioners
were not authorized to communicate ex parte with him in his subsequent role as a member of the
Commission Office of Policy Development. Section 2001.061(c) authorizes agency decision makers
to seek advice through ex parte communications only with an agency employee "who has not
participated" in the contested case hearing "for the purpose of using the special skills or knowledge
of the agency and its staff in evaluating evidence." Tex. Gov't Code Ann. § 2001.061(c).

 The record shows that the Commission was represented in this case by Karen
Hattaway; however, during the last hour and forty-five minutes of the last day of a five-day hearing,
Best filled in for Hattaway. The transcript from that time period shows that Best introduced no
exhibits, put on no direct or rebuttal witnesses, did not cross-examine any witnesses, and did not
present any argument on behalf of the Commission. Nor did Best sign any motions or pleadings on
behalf of the Commission. Based on the foregoing, the trial court found that Best did not participate
in proceeding, and, alternatively, there was no harm.

 Appellant's argument presupposes that by establishing Best's participation, they have
shown reversible error. Appellant's burden of proof at trial, however, was to establish not only that
an ex parte communication occurred but also that the communication fell within the prohibition,
namely, the introduction of "litigious facts before the agency decision makers without becoming part
of the record in the contested case." Young Chevrolet, Inc. v. Tex. Motor Vehicle Bd., 974 S.W.2d
906, 914 (Tex. App.--Austin 1998, pet. denied). Furthermore, appellants had to show that if error
occurred--that Best participated, that Best communicated, and that the agency and Best discussed
"litigious facts"--they were harmed by that error. See Vandygriff v. First Sav. & Loan, Etc., 617
S.W.2d 669, 673 (Tex. 1981) (requiring the party alleging an improper ex parte communication to
establish not only the error but to show harm); see also Tex. Gov't Code Ann. § 2001.174
(prohibiting a court from reversing an agency decision unless the "substantial rights of the appellant
have been prejudiced"). The mere showing of "participation" is insufficient to warrant reversal. 
Appellants fail to draw our attention to a specific communication which would have fallen within
the prohibition, and, if so, how the introduction of litigious facts before the decision makers harmed
them. Points of error eight and nine are overruled.

 Appellants next complain of e-mails and an amicus letter sent by Sam Jones, Director
of the ISO, to the Commissioners, as well as amicus filings by Reliant Energy, the Public Utilities
Board of Brownsville, and Calpine Corporation. The prohibition against ex parte communications
is designed to prevent the injection of new facts in the proceeding while denying a party the
opportunity to rebut those facts. See id. at 914. The mere fact that an ex parte communication
occurred is not sufficient to establish a violation of due process. Id. Section 2001.061 of the
government code sets out an exception to the general prohibition on ex parte communications. See
Tex. Gov't Code Ann. § 2001.061(a). When each party is on notice and has an opportunity to
participate, the communication does not violate section 2001.061. Young, 974 S.W.2d at 912.

 The trial court found, and the evidence supports, that appellants had notice of these
ex parte communications and an opportunity to address them. The e-mails from Sam Jones were
placed in the agency record and a letter was sent to all parties in the case informing them of the
existence of the e-mails. The letter from Sam Jones was served on all parties. The filings by
Reliant, Public Utilities Board, and Calpine were also made part of the administrative record in this
case. Significantly, appellants did not request the opportunity to re-open the evidence to respond to
the communications. We cannot say that the findings made by the trial court that appellants had
notice and an opportunity to be heard with regard to these communications is so against the great
weight of the evidence as to be clearly wrong. Point of error ten is overruled.

 Appellants further complain that communications between the Commission and
Central Power before Central Power filed its application for the CCN constitute impermissible ex
parte communications. This argument is without merit. Communications that do not take place
during the contested case proceeding are not ex parte communications. Vandygriff v. First Sav. &
Loan Assoc., 617 S.W.2d 669, 672 (Tex. 1981). In Vandygriff, the supreme court held that the APA
only "prohibits ex parte communications during pendency of a contested case." Id. at 671. "There
is no contested case until an application . . . is filed." Id. We overrule appellants' eleventh point of
error. 

 In their twelfth point of error, appellants argue that the Commission failed to follow
the requirements of the Open Meetings Act in adopting the order in this case. Specifically,
appellants complain that the final order signed by the Commissioners changed several findings of
fact and conclusions of law from the ALJ's PFD. Appellants claim that a Commission vote is
required to change a finding of fact or conclusion of law from a PFD. However, appellants cite no
authority to support this claim and we are unaware of any such authority. In any event, section
2003.049 of the government code allows the Commission to reevaluate the evidence admitted at a
SOAH hearing to determine whether the ALJ's findings are supported by a preponderance of the
evidence. Tex. Gov't Code Ann. § 2003.049(g) (West 2000). All that is required of the Commission
is that it state in writing the specific reason and legal basis for any changes. Id. § 2003.049(h).

 Even if a Commission vote was required to change a finding of fact of the ALJ,
appellants have failed to preserve error. In order to appeal an administrative agency's decision, a
motion for rehearing is required. See id. § 2001.145 (West 2000). The complainant must succinctly
set forth the legal or factual basis of the error sufficient to provide the agency notice of the alleged
error so that it can either correct it or defend it. See Brown v. Texas Dep't of Ins., 34 S.W.3d 683,
687 (Tex. App.--Austin 2000, no pet.). Appellants failed to raise this issue in a motion for
rehearing. Appellants claim procedural irregularities such as an Open Meetings Act violation are
not required to be included in a motion for rehearing to preserve the error, relying on State Banking
Board v. First State Bank of Gainesville, 618 S.W.2d 905 (Tex. App.--Austin 1981, no writ). 
However, that case stands for the proposition that claims of procedural irregularity not known to a
party at the time of filing motions for rehearing need not be included. See id. at 909.

 Moreover, appellants provided no evidence that the Commissioners failed to vote on
these changes. The only evidence appellants provided in the trial court was the transcript from the
September 20, 2000, meeting where the Commissioners deliberated on the ALJ's PFD for the first
time. There were several additional open meetings held in this docket but appellants did not include
in evidence the transcripts from these open meetings or provide any other proof demonstrating that
the Commission failed to consider and vote on these matters. Accordingly, the trial court found that
appellants failed to prove that there were never any deliberations on the changes to the ALJ's
findings and conclusions. For all of the above reasons, point of error twelve is overruled.

 In their thirteenth point of error, appellants complain that the Commission chairman's
dual role as a decision-maker in this case and as an ERCOT board member violates the common-law
doctrine of incompatibility. The chairman of the Commission is, by statute, an ex officio (non-voting) member of the Board of Directors of ERCOT. See PURA § 39.151(g) (West Supp. 2003). 
It is unclear how appellants claim to have been prejudiced by this dual relationship other than their
claim that it had to lead to impermissible ex parte communications regarding the need for the line
that the Commission approved.

 The trial court found no evidentiary support for appellants' claim of incompatibility
and ex parte communications. In his affidavit introduced in evidence before the trial court,
Chairman Wood swore that during his time of service on the ERCOT board, "specific discussions
about this transmission line did not occur in my presence during the pendency of Docket No. 21741." 
He stated that his practice was to excuse himself from the meeting whenever pending dockets before
the Commission came up for discussion. The presumption is that the Commissioner performed his
duties in compliance with the law, and it is the appellants' burden to show that he did not. 
Vandygriff, 617 S.W.2d at 672-73. The trial court found that appellants made no evidentiary
showing to support their claims of incompatibility and ex parte communications and we have found
nothing in the record to the contrary.

 Appellants further argue that the Commission has improperly delegated its power and
duties to ERCOT. As discussed in detail above, the Commission made its public-need determination
based on the entire evidentiary record before it, including the ISO report recommending in favor of 
the proposed transmission line. However, it was the Commission, not ERCOT, that made the
ultimate determination that there was a public need for the proposed transmission line based on the
record from a lengthy contested case proceeding. The trial court found that appellants failed to
present evidence sufficient to overcome the presumption that the Commission's final order is based
on a valid exercise of its power and discretion. We agree. Therefore, we overrule point of error
thirteen.

 In appellants' fourteenth and final point of error, they claim that the trial court erred
by sustaining the Commission's assertions of privilege as to certain documents. Specifically,
appellants served various discovery requests on the Commission and Central Power which they
believed were related to the procedural errors complained of above. The documents at issue are
certain e-mails as well as the Commissioners' briefing materials. The trial court found the e-mails
were subject to both the attorney-client and work-product privileges and the briefing materials were
privileged under the attorney-client, work-product, and deliberative-process privileges. 

 Appellants argue that the trial court erred by sustaining the Commission's claims of
privilege based on the attorney-client and deliberative-process privileges. The trial court, however,
based its rulings as to both sets of documents on the work-product privilege, in addition to other
privileges. Appellants do not advance an argument that the trial court erred in withholding the
documents on the basis of the work-product privilege. Because the trial court's ruling stands
unchallenged based on the work-product privilege, point of error fourteen is overruled.


CONCLUSION


 Having overruled all of appellants' points on appeal, we affirm the judgment of the
district court, affirming the Commission's order.



 

 David Puryear, Justice

Before Justices Patterson, Puryear and Powers*

Affirmed

Filed: October 23, 2003




* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. The appendix to this opinion lists the appellants and appellees individually.
2. Effective December 23, 2002, the legal name of Central Power and Light Company has
been changed to Centrica plc. We will refer to it as "Central Power" for purposes of this opinion.
3. The Commission issued its original order on November 30, 2000. Several appellants
moved for rehearing, which the Commission granted in part. On April 25, 2001, the Commission
issued its Second Order on Rehearing. Appellants again filed motions for rehearing on the Second
Order, which the Commission denied. Therefore, the Second Order on Rehearing is the final order
that is the subject of this appeal.
4. Because ERCOT is a wholly intrastate power grid, the federal scheme administered by the
Federal Energy Regulatory Commission does not generally govern ERCOT.
5. Section 39.155 of the utility code requires ERCOT to issue an annual report to the
Commission "identifying existing and potential transmission and distribution constraints and system
needs within ERCOT, alternatives for meeting system needs, and recommendations for meeting
system needs." Tex. Util. Code Ann. § 39.155 (hereinafter "PURA") (West Supp. 2003).
6. The ALJ concluded that Central Power had failed to meet its burden to demonstrate a
public necessity for the proposed line based on the fact that the 1999 ERCOT report stated that the
constraint on the import of power to the Corpus Christi area and points south, which were first
identified in October 1998, were substantially addressed since four new cogeneration units came on
line in South Texas during the summer of 1999. The ALJ reasoned that the original justification for
the proposed line identified by the ISO has been addressed.
7. Section 14.051 of PURA allows the Commission to conduct its own hearings and make
findings of fact. PURA § 14.051(1), (5) (West 1998).
8. As part of their argument, appellants complain that, the Commission, by approving Central
Power's application on the broad grounds stated by the Commission, renders useless the alternative
standards added in PURA section 39.203. We find this argument without merit. Section 39.203
addresses a situation where the Commission requires a utility to construct transmission facilities to
"ensure safe and reliable service for the state's electric markets." PURA § 39.203 (West Supp.
2003). The Commission determined in this case that section 39.203(e) was limited in application
to transmission projects deemed "critical" by ERCOT and this transmission project was not deemed
"critical." 
9. Although it was not statutorily required to do so, the Commission did consider routes
paralleling existing rights of way and rejected them. The Commission adopted the ALJ's proposal
for decision discussing the routes paralleling existing rights of way and concluding that the routes
exiting the north side of the Coleto Creek Power Plant were properly discounted. The northern
routes contained a greater number of wetlands, stream crossings, vegetation clearing, and residences
within 200 feet of the proposed centerline.
10. Now codified as PURA § 37.056(c) (West 1998).